# EXHIBIT A

**EXECUTION COPY**

PREFERRED STOCK PURCHASE AGREEMENT

By and Between

IDAHO FIRST BANK

and

ALCAR LLC

Dated as of April 28, 2009

## Table of Contents

Page

### ARTICLE I
#### Definitions
Section 1.01.     Definitions.............................................................................................................1

### ARTICLE II
#### Sale and Purchase of the Securities
Section 2.01.     Purchase and Sale of the Securities ...................................................................7
Section 2.02.     Purchase Price.....................................................................................................7
Section 2.03.     The Closing..........................................................................................................7
Section 2.04.     Additional Issuances; Purchase Price Adjustment..............................................8
Section 2.05.     Deposit .................................................................................................................9
Section 2.06.     Option to Purchase Additional Securities. ........................................................10

### ARTICLE III
#### Representations and Warranties
Section 3.01.     Representations and Warranties of the Bank .....................................................10
Section 3.02.     Representations and Warranties of Purchaser....................................................20

### ARTICLE IV
#### Additional Agreements of the Parties
Section 4.01.     Taking of Necessary Action; Other Actions......................................................22
Section 4.02.     Financial Statements and Other Reports............................................................22
Section 4.03.     Conduct of the Business.....................................................................................23
Section 4.04.     Inspection of Property........................................................................................25
Section 4.05.     Securities Laws; Legends; Transferability.........................................................26
Section 4.06.     Lost, Stolen, Destroyed or Mutilated Securities ...............................................26
Section 4.07.     Regulatory Matters.............................................................................................26
Section 4.08.     Board of Directors...............................................................................................27
Section 4.09.     Recommendation; No-Shop................................................................................27
Section 4.10.     Registration Rights.............................................................................................29
Section 4.11.     Post-Signing Due Diligence...............................................................................30

### ARTICLE V
#### Conditions
Section 5.01.     Conditions of Purchaser at Closing....................................................................30
Section 5.02.     Conditions of Bank at Closing...........................................................................32
Section 5.03.     Conditions to All Parties' Obligations...............................................................32

### ARTICLE VI
#### Miscellaneous
Section 6.01.     Survival of Representations and Warranties.......................................................32
Section 6.02.     Notices ................................................................................................................33
Section 6.03.     Entire Agreement; Third Party Beneficiaries; Amendment...............................34

Section 6.04.    Termination; Effect of Termination ................................................................34
Section 6.05.    Counterparts ..............................................................................................36
Section 6.06.    Governing Law ...........................................................................................36
Section 6.07.    Public Announcements .................................................................................36
Section 6.08.    Expenses and Fees. .....................................................................................36
Section 6.09.    Indemnification. ..........................................................................................37
Section 6.10.    Successors and Assigns..................................................................................39
Section 6.11.    Remedies; Waiver........................................................................................40
Section 6.12.    [Reserved.] .................................................................................................40
Section 6.13.    Consent to Jurisdiction; WAIVER OF JURY TRIAL.......................................40
Section 6.14.    Severability ................................................................................................40
Section 6.15.    Headings ...................................................................................................40
Section 6.16.    Aggregation................................................................................................40
Section 6.17.    Specific Performance ...................................................................................40
Section 6.18.    Arm's Length Transactions.............................................................................40
Section 6.19.    No Presumption ...........................................................................................41
Section 6.20.    Further Assurance ........................................................................................41

Exhibits

A  -  Form of Fourth Amended and Restated Articles of Incorporation of Idaho First Bank

B  -  Form of Voting Agreement

C  -  Form of Amended and Restated Bylaws of Idaho First Bank

Schedules

A  -  List of Stockholders of Idaho First Bank Executing Voting Agreement

## PREFERRED STOCK PURCHASE AGREEMENT

PREFERRED STOCK PURCHASE AGREEMENT (the "Agreement ), dated as of April 28, 2009 (the "Agreement Date ), by and between Alcar LLC, a Delaware limited liability company (the "Purchaser ) and Idaho First Bank, an Idaho corporation (the "Bank ). Capitalized terms not otherwise defined where used shall have the meanings ascribed thereto in ARTICLE I.

### RECITALS:

WHEREAS, at the Closing (as defined below) Purchaser has agreed to purchase and the Bank has agreed to issue or sell, subject to the terms and conditions of this Agreement, seven thousand one hundred (7,100) shares of the Bank's Series A convertible preferred stock, par value $1,000 per share (the "Securities ), which is convertible into Common Stock in accordance with the designations, relative rights, preferences and limitations set forth in the Fourth Amended and Restated Articles of Incorporation attached hereto as Exhibit A (the "Revised Certificate );

WHEREAS, concurrently with the execution of this Agreement, Bank and certain of its Stockholders (as defined below) listed on Schedule A hereto are entering into a Voting Agreement of even date herewith substantially in the form of Exhibit B hereto (the "Voting Agreement ) pursuant to which such Stockholders have agreed, subject to the terms thereof, to take specified actions in furtherance of the approval of the sale of the Securities by the Stockholders of the Bank as required by Idaho Law and to vote in favor of the matters requiring Stockholder Approval (as defined below);

WHEREAS, concurrently with the execution of this Agreement and pursuant to the terms set forth in Section 2.05 of this Agreement, Purchaser is funding the Deposit Account (as defined below) in an amount equal to the Deposit Amount (as defined below); and

WHEREAS, the Bank and Purchaser desire to set forth certain agreements herein.

NOW THEREFORE, in consideration of the premises and the representations, warranties and agreements herein contained and intending to be legally bound hereby, the parties hereby agree as follows:

### ARTICLE I

### Definitions

Section 1.01. Definitions. As used in this Agreement, the following terms shall have the meanings set forth below:

"Acquisition Proposal shall have the meaning set forth in Section 4.09(d)(i).

"Affiliate or "affiliate shall mean, with respect to any Person, any other Person which directly or indirectly controls or is controlled by or is under common control with such Person. As used in this definition, "control (including its correlative meanings, "controlled by and "under common control with ) shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or

partnership or other ownership interests, by contract or otherwise). To the extent that any such term is used in relation to or in connection with any statute and the definition of such term in such statute is broader or different, then, in such context, such term shall have the meaning set forth in such statute.

"Agreement  shall have the meaning set forth in the preamble hereto.

"Agreement Date  shall have the meaning set forth in the preamble hereto.

"Ancillary Documents  shall mean the Voting Agreement and any other agreements entered into in connection with the consummation of the Agreement.

"Bank  shall have the meaning set forth in the preamble hereto.

"Bank Disclosure Schedule  shall have the meaning set forth in Section 3.01.

"Bank Group  shall have the meaning set forth in Section 3.01(j)(i).

"Bank Indemnitees  shall have the meaning set forth in Section 6.09(b).

"Bank Pension Plans  and "Bank Plans  shall have the meanings set forth in Section 3.01(j).

"Bank Regulator  shall mean any federal or state banking regulator, including but not limited to the FDIC, the Board of Governors of the U.S. Federal Reserve ("FRB ) and the Idaho Department of Finance (the "Department ), which regulates the Bank.

"Bank Regulatory Reports  shall mean any reports filed with a Bank Regulator.

"Board of Directors  shall mean the board of directors of the Bank.

"Board Representative  shall have the meaning set forth in Section 4.08(a).

"Business Day  shall mean any day, other than a Saturday, Sunday or a day on which banking institutions in the City of New York, New York are authorized or obligated by law or executive order to close.

"Business Records  means all data and records of the respective business of the Bank on whatever media and wherever located.

"Bylaws  means the bylaws of the Bank.

"Closing  and "Closing Date  shall have the meanings set forth in Section 2.03(a).

"Code  shall mean the United States Internal Revenue Code of 1986, as amended.

"Common Stock  shall mean shares of common stock of the Bank, par value $5.00 per share.

-2-

"Competitor shall mean any of the entities listed on Section 1.01 of the Bank Disclosure Schedule.

"Deductible shall have the meaning set forth in Section 6.09(d).

"Department shall have the meaning set forth in the definition of "Bank Regulator.

"Deposit Account shall have the meaning set forth in Section 2.05.

"Deposit Amount shall have the meaning set forth in Section 2.05.

"Diligence Period shall have the meaning set forth in Section 4.11.

"Director shall mean the Director of the Department.

"Encumbrance shall mean any mortgage, pledge, lien, encumbrance, claim, charge, security interest, or other restriction.

"ERISA shall have the meaning set forth in Section 3.01(j)(i).

"Exchange Act shall mean the Securities Exchange Act of 1934, as amended.

"Executive Officer shall mean any executive officer of the Bank subject to FRB Regulation "O and, by Board of Directors' exemption, shall not include any officer at or below the vice president level.

"Fairness Opinion shall mean the unqualified opinion of a nationally recognized expert in financial transactions in whose opinion the consideration for the transaction contemplated by the Agreement is fair, from a financial point of view, to the Stockholders of the Bank.

"FDIC shall mean the Federal Deposit Insurance Corporation.

"Financial Statements shall have the meaning set forth in Section 3.01(f)(i).

"FRB shall have the meaning set forth in the definition of "Bank Regulator .

"GAAP shall mean generally accepted accounting principles in the United States of America.

"Governmental Consents shall have the meaning set forth in Section 3.01(d).

"Governmental Entity shall mean any court, administrative agency or commission or other governmental authority or instrumentality, whether federal, state, local or foreign, and any applicable industry self-regulatory organization.

"Indemnified Party shall have the meaning set forth in Section 6.09(f).

"Indemnifying Party shall have the meaning set forth in Section 6.09(f).

"Intellectual Property" shall mean trademarks, service marks, brand names, certification marks, trade dress and other indications of origin, the goodwill associated with the foregoing and registrations in any jurisdiction of, and applications in any jurisdiction to register, the foregoing, including any extension, modification or renewal of any such registration or application; inventions, discoveries and ideas, whether patentable or not, in any jurisdiction; patents, applications for patents (including divisions, continuations, continuations in part and renewal applications), and any renewals, extensions or reissues thereof, in any jurisdiction; nonpublic information, trade secrets and confidential information and rights in any jurisdiction to limit the use or disclosure thereof by any person; writings and other works, whether copyrightable or not, in any jurisdiction; and registrations or applications for registration of copyrights in any jurisdiction, and any renewals or extensions thereof; and any similar intellectual property or proprietary rights.

"IRS" shall have the meaning set forth in Section 3.01(k).

"Loss" shall have the meaning set forth in Section 6.09(a).

"Material Adverse Effect" shall mean any material adverse effect on (a) the financial condition, results of operations, assets, liabilities or business of the Bank (provided, however, that, with respect to this clause (a), a "Material Adverse Effect" shall not be deemed to include any effects to the extent resulting from (i) changes, after the date hereof, in generally accepted accounting principles or regulatory accounting requirements applicable to FDIC insured depository institutions similar in nature to the Bank, (ii) changes, after the date hereof, in laws, rules or regulations of general applicability or interpretations thereof by Governmental Entities, (iii) actions of the Bank taken with the prior written consent of Purchaser, (iv) changes, after the date hereof, in general economic or market conditions generally affecting FDIC insured depository institutions similar in nature to the Bank, (v) the failure in and of itself of the Bank to meet any internal projections, forecasts or estimates or earnings for any period ending on or after March 31, 2009 (provided that the reasons or causes of any such failure shall be included), or (vi) changes in global, national or regional political conditions, including the outbreak or escalation of war or acts of terrorism, except, with respect to clauses (i), (ii), (iv) and (vi), to the extent such changes are disproportionately adverse to the financial condition, results of operations, assets, liabilities or business of the Bank, as compared with other companies participating in the applicable industry) and provided that with respect to effects that have an impact on the balance sheet of the Bank, in order to be a Material Adverse Effect such effect must have an effect in excess of 15% of Tier One Capital, (b) the ability of the Bank to perform its obligations under this Agreement or the Ancillary Documents or (c) the validity or enforceability of this Agreement or any of the Ancillary Documents or the rights or remedies of Purchaser hereunder and thereunder.

"Memorandum of Understanding" means any Memorandum of Understanding issued by the FDIC or the Department to the Bank, including but not limited to such Memorandum of Understanding issued by the FDIC and the Department to the Bank on January 10, 2008 and on July 8, 2008, as modified from time to time.

"Most Recent Audited Financial Statements" has the meaning set forth in Section 3.01(f)(i).

"Most Recent Unaudited Financial Statements  has the meaning set forth in Section 3.01(f)(i).

"Option Shares  shall have the meaning set forth in Section 2.06.

"Person  or "person  shall mean an individual, corporation, association, partnership, group (as such term is used in Section 13(d)(3) of the Exchange Act), trust, joint venture, business trust or unincorporated organization, or a government or any agency or political subdivision thereof.

"Pre-Closing Period  shall have the meaning set forth in Section 4.03(a).

"Preferred Stock  shall have the meaning set forth in Section 3.01(e).

"Proxy Statement  shall have the meaning set forth in Section 4.09(a).

"Purchase Price  shall have the meaning set forth in Section 2.02.

"Purchaser  shall have the meaning set forth in the preamble hereto.

"Purchaser Indemnitees  shall have the meaning set forth in Section 6.09(a).

"Purchaser Information  shall have the meaning set forth in Section 3.02(f).

"Purchaser Termination Fee  shall have the meaning provided in Section 6.04(j).

"Recommendation  shall have the meaning set forth in Section 4.09(a).

"Registrable Securities  shall have the meaning provided in Section 4.10.

"Registration Rights Agreement  shall have the meaning provided in Section 4.10.

"Regulatory Approvals  means the approval of or non-disapproval by any Bank Regulator that is necessary in connection with the consummation of the Transactions.

"Regulatory Filings  shall have the meaning set forth in Section 3.01(p).

"Restated Articles of Incorporation  shall mean the Third Amended and Restated Articles of Incorporation of the Bank.

"Revised Certificate  shall have the meaning set forth in the Recitals.

"SEC  shall mean the United States Securities and Exchange Commission.

"Securities  shall have the meaning set forth in the Recitals.

"Securities Act  shall mean the Securities Act of 1933, as amended.

"Seller Termination Fee and Expenses shall mean $250,000 plus an amount equal to the reasonable, documented out-of-pocket expenses as set forth in Section 6.08(b).

"Stockholder Approval shall mean an affirmative vote of holders of at least two-thirds of the shares of the Bank's Common Stock outstanding and entitled to vote on the applicable record date approving the sale of the Securities to Purchaser as a control share acquisition under the Control Share Acquisition Act (Idaho Business Corporation Act §30-1601, et. seq.) and the filing of the Revised Certificate.

"Stockholder Meeting shall have the meaning set forth in Section 4.09(a).

"Stockholder(s) means the record holders of shares of Common Stock, as set forth on Section 1.01 of the Bank Disclosure Schedule.

"Stock Purchase shall have the meaning set forth in Section 2.01.

"Stock Rights shall mean all options, warrants, rights to subscribe to, scrip calls, contracts, undertakings, arrangements and commitments to issue which may result in the issuance of equity securities of the Company.

"Subsidiary shall mean, with respect to any Person, any other Person of which 50% or more of the shares of the voting securities or other voting interests are owned or controlled, or the ability to select or elect 50% or more of the directors or similar managers is held, directly or indirectly, by such first Person or one or more of its Subsidiaries, or by such first Person, or by such first Person and one or more of its Subsidiaries.

"Superior Proposal shall have the meaning set forth in Section 4.09(d)(ii).

"Tax or "Taxes shall mean all federal, state, local, and foreign income, excise, gross receipts, gross income, ad valorem, profits, gains, property, capital, sales, transfer, use, payroll, employment, severance, withholding, duties, intangibles, franchise, backup withholding, and other taxes, charges, levies or like assessments together with all penalties and additions to tax and interest thereon.

"Tax Return shall mean a report, return or other information (including any amendments) required to be supplied to a governmental entity with respect to Taxes including, where permitted or required, combined returns for any group of entities that includes the Bank.

"Terminating Breach shall have the meaning set forth in Section 6.04(e).

"Tier One Capital shall mean core capital as established by current FDIC rules and regulations, Part 325, as applied to the Bank.

"Transactions shall have the meaning set forth in Section 3.01(c).

"Transfer shall mean, directly or indirectly, to sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation

-6-

or similar disposition of, and shall include a short sale or the entry into of any other hedging or other derivative transaction that has the effect of materially changing the economic benefits and risks of ownership.

"Voting Agreement  shall have the meaning set forth in the Recitals hereto.

"Voting Debt  shall have the meaning set forth in Section 3.01(e).

General Interpretive Principles.  Whenever used in this Agreement, except as otherwise expressly provided or unless the context otherwise requires, any noun or pronoun shall be deemed to include the plural as well as the singular and to cover all genders. The name assigned this Agreement and the section captions used herein are for convenience of reference only and shall not be construed to affect the meaning, construction or effect hereof. Whenever the words "include,  "includes,  or "including  are used in this Agreement, they shall be deemed to be followed by the words "without limitation.  Unless otherwise specified, the terms "hereto, "hereof,  "herein  and similar terms refer to this Agreement as a whole (including the exhibits, schedules and disclosure statements hereto), and references herein to Articles or Sections refer to Articles or Sections of this Agreement.

## ARTICLE II

### Sale and Purchase of the Securities

Section 2.01.  Purchase and Sale of the Securities.  Subject to the satisfaction or waiver of the conditions set forth in Section 5.01 and Section 5.02 of this Agreement, and in reliance upon the representations and warranties hereinafter set forth, Bank hereby agrees to sell, assign, transfer and deliver the Securities to Purchaser, and Purchaser hereby agrees to purchase, the Securities from the Bank (the "Stock Purchase ), free and clear of all liens, encumbrances and restrictions of any kind.

Section 2.02.  Purchase Price.  The aggregate purchase price to be paid by Purchaser for all of the Securities (the "Purchase Price ) shall be $7,100,000.

Section 2.03.  The Closing.

(a) Upon the terms and subject to the conditions of this Agreement, the closing of the Stock Purchase (the "Closing ) shall take place at the offices of Fried Frank LLP, 1001 Pennsylvania Avenue, NW, Washington, DC 20004, at 10:00 a.m., Washington, DC time, on the third (3rd) Business Day following the satisfaction or waiver of the conditions set forth in ARTICLE V hereof (other than those conditions which by their terms are only capable of being satisfied at Closing), or at such other time, date or place as Purchaser and the Bank shall otherwise agree. The date on which the Closing occurs is hereinafter referred to as the "Closing Date.

(b) At the Closing:

(A) the Bank will deliver to Purchaser certificates representing 7,100 shares of Securities registered in the name of Purchaser;

-7-

(B) (1) Purchaser, in full payment for such shares of the Securities, will deliver to Bank the Purchase Price <u>less</u> the Deposit Amount, by wire transfer of immediately available funds to the accounts set forth on Bank Disclosure Schedule 2.03;

(2) Purchaser and the Bank will agree to release the Deposit Amount to the Bank; and

(C) each party shall take or cause to happen such other actions, and shall execute and deliver such other instruments or documents, as shall be required under Section 5.01 and Section 5.02.

Section 2.04.   <u>Additional Issuances; Purchase Price Adjustment</u>.

(a) In addition to and without limitation of any other indemnities in this Agreement, as a protection to Purchaser against the existence of issued shares or other equity securities of the Bank not disclosed in Section 3.01(e) in the event that, at any time after the Closing, the representation and warranty set forth in the last sentence of Section 3.01(e) is determined not to have been true as of the Closing, the Bank shall issue to Purchaser, at no cost to Purchaser, and as an adjustment to the Purchase Price paid by Purchaser, an additional amount of Securities such that, if such issuance of additional Securities had been made at Closing, such representation and warranty would have been true and accurate in all respects at the Closing.

(b) If at the time of any required adjustment pursuant to Section 2.04(a) all Securities have been converted into Common Stock, the Bank shall promptly issue to Purchaser, at no cost to Purchaser and as an adjustment to the Purchase Price paid by Purchaser, an additional amount and kind of shares of Common Stock equal to the amount and kind of shares of Common Stock issuable upon the conversion (based on the conversion ratio that would have been in effect if the Securities were outstanding and had not been converted into Common Stock) of the amount of Securities which would have been issued with respect to such adjustment pursuant to Section 2.04(a), treating the Securities for purposes of such purchase price adjustment as not having been converted into Common Stock.

(c) Any additional Securities and shares of Common Stock issued to Purchaser pursuant to this Section 2.04 shall be treated as if they were issued at the Closing and shall reflect any dividends or other distributions which would have accrued or have been payable with respect to and the application of any anti-dilution, ratable treatment or similar provisions which would have been applicable to such Securities and shares of Common Stock had they been issued at the Closing.

(d) In connection with any issuances of stock pursuant to this Section 2.04, the Bank (i) shall take all action necessary to increase the authorized capital of the Bank to permit such issuances and (ii) shall reserve a sufficient number of shares of Common Stock for issuance to Purchaser upon the conversion of the Securities so issued. Any Securities or shares of Common Stock issued to Purchaser pursuant to this Section 2.04 shall, when issued, be validly issued and fully paid and assessable, with no personal liability attaching to the ownership

-8-

thereof, free and clear of all Encumbrances and not be subject to any preemptive rights except as contemplated by this Agreement.

Section 2.05.  Deposit.

(a) Purchaser agrees concurrently with the execution of this Agreement to deposit the amount of $2,500,000 in cash (the "Deposit Amount ) to an FDIC insured interest-bearing account at the Bank in the name of Purchaser opened according to the Bank's normal policies regarding deposit accounts (the "Deposit Account ) by wire transfer of immediately available funds and in accordance with the terms of this Agreement and to not withdraw the Deposit Amount from the Deposit Account until the termination of this Agreement or the Closing, provided, that, upon the Closing, the Deposit Amount shall be released to the Bank and shall be credited for the benefit of Purchaser against the amount due under Section 2.02. In the event the Agreement is terminated for any reason prior to Closing, Bank shall pay the Deposit Amount plus any accrued interest to the Purchaser within one (1) business day of such termination, regardless of the reason for such termination. The Bank is a participant in the expanded FDIC program for transaction accounts which program expires on December 31, 2009. As a result, the entire Deposit Amount will be FDIC insured.

(b) Investment of Deposit Amount. Bank shall invest and reinvest the Deposit Amount held in the Deposit Account in accordance with written instructions delivered to Bank from Purchaser; provided, that the full amounts of the Deposit Amount shall be FDIC-insured at all times.

(c) Disposition and Termination. The Deposit Amount shall be released as follows:

(i) upon Closing, Purchaser shall deliver written notification to Bank that the Deposit Amount should be released to Bank; or

(ii) upon termination of this Agreement for any reason prior to Closing, Purchaser shall deliver written notification to Bank that the Deposit Amount should be delivered to Purchaser, and Bank shall so deliver the Deposit Amount in accordance with the last sentence of Section 2.05(a).

(d) Compensation and Reimbursement. The Bank will not receive any compensation or reimbursement in connection with the Deposit Amount.

(e) Tax Reporting. All interest or other income earned under the Deposit Agreement shall be allocated to Purchaser and reported, as and to the extent required by law, by the Bank to the IRS, or any other taxing authority, on IRS Form 1099 or 1042S (or other appropriate form) as income earned from the Deposit Amount by Purchaser whether or not said income has been distributed during such year. Any other tax returns required to be filed will be prepared and filed by the Bank or Purchaser with the IRS and any other taxing authority as required by law. The parties acknowledge and agree that any taxes payable from the income earned on the investment of any sums held in the Deposit Account shall be paid by Purchaser.

Section 2.06.   Option to Purchase Additional Securities.

Following the date hereof, Purchaser shall have the option, at any time and in its sole discretion, to purchase additional shares of Securities (the "Option Shares ) under the same terms and conditions as set forth in this Agreement, including the same purchase price per share for the Securities as is set forth in Section 2.02. The number of Option Shares issuable under the this Section 2.06 are to be calculated such that the number of Securities purchased on the Agreement Date plus the number of Option Shares issuable pursuant to this Section 2.06 shall be equal to 51% of the outstanding Common Stock of the Bank assuming the exercise of any and all Stock Rights which are outstanding immediately following the Closing.

## ARTICLE III

## Representations and Warranties

Section 3.01.   Representations and Warranties of the Bank. Except as disclosed in the disclosure schedule (the "Bank Disclosure Schedule ) which will be delivered by the Bank to Purchaser pursuant to Section 4.11(b) of this Agreement (which schedule will set forth, among other things, items, the disclosure of which is necessary or appropriate, either in response to an express disclosure requirement contained in a provision hereof or as an exception to one or more representations or warranties contained in this Section 3.01, or to one or more of the Bank's covenants; provided, however, that disclosure in any section of such Bank Disclosure Schedule shall apply only to the indicated Section of this Agreement except to the extent that it is reasonably apparent that such disclosure is relevant to another Section of this Agreement), the Bank represents and warrants to Purchaser, as of the date hereof and as of the Closing Date (or as of such specific date in the case of any representation or warranty expressly made as of a specific date), as follows:

(a) Organization and Good Standing of the Bank; Organizational Documents. The Bank is an Idaho state-chartered bank duly organized, validly existing and in good standing under the laws of the State of Idaho and has all requisite corporate power and authority and governmental authorizations to own, operate and lease its properties and to carry on its business as it is being conducted on the date of this Agreement. True, complete and correct copies of the Bank's Restated Articles of Incorporation and Bylaws, as in effect as of the date of this Agreement, have previously been made available to Purchaser. The deposit accounts of the Bank are insured by the FDIC to the fullest extent permitted by the Federal Deposit Insurance Act and the rules and regulations of the FDIC thereunder, and all premiums and assessments required to be paid in connection therewith have been paid by the Bank when due.

(b) Subsidiaries. The bank does not have any Subsidiaries nor does it presently own, directly or indirectly, any capital stock or other equity interest, or rights or obligations to acquire the same, in any Person.

(c) Authorization; No Conflicts.

(i)      The Bank has full corporate or other organizational power and authority to execute and deliver this Agreement and the Ancillary Documents to which it is or

-10-

will be a party and to consummate the transactions contemplated hereby and thereby (the "Transactions"). The execution, delivery and performance by the Bank of this Agreement and each Ancillary Document to which it is or will be a party and the consummation of the Transactions (including the issuance of the Securities as contemplated by this Agreement and the terms of the Revised Certificate) have been duly authorized by the Board of Directors (or equivalent governing body) of the Bank in accordance with applicable law and the Restated Articles of Incorporation and the Board of Directors has resolved to submit the matters requiring Stockholder Approval to the Stockholders pursuant to Section 4.09. Except for the receipt of the Stockholder Approval, no other corporate or other organizational proceedings on the part of the Bank are necessary to authorize the execution, delivery and performance by the Bank of this Agreement and each Ancillary Document and consummation of the Transactions (including the issuance of the Securities as contemplated by this Agreement). This Agreement has been, and at or prior to the Closing, each Ancillary Document to which it is a party will be, duly and validly executed and delivered by the Bank. This Agreement is, and upon its execution at or prior to the Closing, each Ancillary Document to which it is a party will be, a valid and binding obligation of the Bank and enforceable against it in accordance with its terms.

(ii)    The execution, delivery and performance of this Agreement and the Ancillary Documents, the consummation by the Bank of the Transactions and the compliance by the Bank with any of the provisions hereof and thereof will not conflict with, violate or result in a breach of any provision of, or constitute a default (or an event which, with notice or lapse of time or both would constitute a default) under, or give rise to any rights of any Person other than the parties to this Agreement or the Ancillary Documents or give rise to any obligations of the Bank other than under this Agreement and the Ancillary Documents under, or result in the termination of or accelerate the performance required by, or result in a right of termination or acceleration under (x) any provision of the Restated Articles of Incorporation or Bylaws of the Bank or (y) any mortgage, note, indenture, deed of trust, lease, loan agreement, commitment, arrangement, written or oral contract or other agreement or instrument or any permit, concession, grant, franchise, license, judgment, order, decree, ruling, injunction, statute, law, ordinance, rule or regulation applicable to the Bank or any of its properties or assets, other than any such conflict, violation, breach, default, rights, obligations, termination and acceleration under clause (y) that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

(d) Governmental Consents. Except for (i) the receipt of the Regulatory Approvals, and compliance with any conditions contained therein and (ii) the Governmental Consents set forth in Section 3.01(d) of the Bank Disclosure Schedule, no consents, licenses, approvals or authorizations of, or registrations, declarations or filings with, any Governmental Entity ("Governmental Consents") are required to be obtained or made by the Bank in connection with the execution, delivery, performance, validity and enforceability of this Agreement or any Ancillary Documents to which the Bank is or will be a party or the consummation by the Bank of the Transactions.

(e) Capitalization. The authorized capital stock of the Bank consists of (i) 5,000,000 shares of Common Stock of which, as of April 24, 2009, 1,376,584 shares were issued and outstanding, (ii) 10,000 shares of preferred stock, $1,000 par value, of the Bank (the "Preferred Stock") of which, as of the date hereof, no shares were issued and outstanding and

-11-

(iii) options and warrants to purchase an aggregate of 337,639 shares of Common Stock as of April 24, 2009. As of the date hereof, the Bank held no shares of Common Stock in its treasury. All of the issued and outstanding shares of the Bank's Common Stock have been duly and validly authorized and issued and are fully paid and assessable, and are not subject to preemptive rights. No bonds, debentures, notes or other indebtedness having the right to vote on any matters on which the stockholders of the Bank may vote ("Voting Debt ) are issued and outstanding. Except as set forth in Section 3.01(e) of the Bank Disclosure Schedule, no equity securities or Voting Debt of the Bank are or may be required to be issued by reason of any options, warrants, rights to subscribe to, calls or commitments of any character whatsoever, there are outstanding no equity securities or rights convertible into or exchangeable for any equity securities or Voting Debt of the Bank, and there are no contracts, commitments, understandings or arrangements by which the Bank is bound to issue additional equity securities or Voting Debt or options, warrants or rights to purchase or acquire any additional equity securities or Voting Debt. The consummation of the Transactions contemplated by this Agreement will not result in the triggering of any anti-dilution adjustment provisions of any security of the Bank convertible into equity securities of the Bank. Immediately following the Closing, the Securities will represent, in the aggregate, 51% of the outstanding Common Stock on the date hereof and 45.3% of the fully-diluted Common Stock on the date hereof (treating for purposes of such fully-diluted calculation any and all Stock Rights outstanding immediately following the Closing as having been converted, exchanged or exercised on the date hereof.)

(f) Financial Statements; Controls.

(i)    In General. Section 3.01(f)(i) of the Bank Disclosure Schedule sets forth the following financial statements (the "Financial Statements ): (i) the audited balance sheet of the Bank as of December 31, 2006, and the related statements of income, changes in equity and cash flows for the year ending December 31, 2006, (ii) the audited balance sheet of the Bank as of December 31, 2007, and the related audited statements of operations and cash flows, respectively, for the twelve (12)-month period ended on such date (the "Most Recent Audited Financial Statements ), and (iii) the unaudited balance sheet of the Bank as of December 31, 2008, and the related unaudited statements of operations, for the twelve (12)-month period ended on such date (the "Most Recent Unaudited Financial Statements ). Except as set forth in Section 3.01(f)(i) of the Bank Disclosure Schedule, each of the Financial Statements has been prepared in accordance with GAAP applied on a basis consistent with prior periods and fairly presents in all material respects the financial condition of the Bank as of its respective date and the results of operations and stockholders' equity, or cash flows, as the case may be, of the Bank for the period covered thereby, subject, in the case of the unaudited statements, to the absence of footnote disclosure and to normal, recurring end-of-period adjustments which are, in the aggregate, not material.

(ii)    Financial Books and Records. The financial books and records of the Bank have been maintained in accordance with customary business practices and fairly and accurately reflect, in all material respects, on a basis consistent with past periods and throughout the periods involved, the financial position of the Bank. Within the last three (3) years, except as set forth in Section 3.01(f)(i) of the Bank Disclosure Schedule, the Bank has not received any advice or notification from its independent accountants that the Bank has used any improper accounting practice that would have the effect of not reflecting or incorrectly reflecting in a

material respect in the Business Records of the Bank any properties, assets, liabilities, revenues, expenses, equity accounts or other accounts.

(iii)    No Undisclosed Liabilities.  Except as reflected in the Most Recent Unaudited Financial Statements or as set forth in Section 3.01(f)(i) of the Bank Disclosure Schedule, the Bank does not have any Liabilities (whether or not the subject of any other representation or warranty hereunder) except for Liabilities that may have arisen in the ordinary course of business since December 31, 2008 and which have not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(iv)    Projections.  Any financial projections provided by the Bank to Purchaser in connection with Purchaser's review of the Bank were prepared in good faith based upon assumptions believed by the Bank's management to be reasonable at the time made (it being understood and acknowledged by Purchaser that projections are subject to uncertainties and contingencies and that actual results may differ in a material respect from such projections).

(v)    Bank Regulatory Reports.  The Bank has previously made available to Purchaser the Bank Regulatory Reports filed since January 1, 2007.  The Bank Regulatory Reports have been prepared in all material respects in accordance with applicable regulatory accounting principles and practices throughout the periods covered by such statements.

(g)  Absence of Certain Changes.  Except as set forth in Section 3.01(g) of the Bank Disclosure Schedule, since January 1, 2009 the Bank has conducted its business in the ordinary course and in a manner consistent with past practice, and there has not been any event that has had, or would be reasonably expected to have (either individually or in the aggregate), a Material Adverse Effect.  Without limiting the generality of the foregoing, except as set forth in Section 3.01(g) of the Bank Disclosure Schedule or as reflected on the Most Recent Unaudited Financial Statements, since the date of the Most Recent Unaudited Financial Statements, the Bank has not taken any action or failed to take any action, prior to the date of this Agreement, which such action or failure, if taken after the date of this Agreement, would represent or result in a breach or violation of any of the covenants and agreements (including, without limitation, under Section 4.03) of the Bank as provided in this Agreement.

(h)  Compliance with Applicable Law.  The Bank holds all licenses, franchises, permits and authorizations necessary for the lawful conduct of its business under, and has complied in all material respects and is not in default or violation in any respect of, any law, statute, order, rule, regulation, policy or guideline of any federal, state or local governmental authority applicable to the Bank, other than such non-compliance, defaults or violations that, individually or in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Effect.

(i)  Legal Proceedings.  Except as set forth in Section 3.01(i) of the Bank Disclosure Schedule, the Bank is not a party to any, and there are no pending, or to the knowledge of the Bank, threatened, legal, administrative, arbitral or other proceedings, claims, actions or governmental investigations of any nature against the Bank or to which any of its assets are subject that, (i) individually or in the aggregate, has had or would reasonably be

-13-

expected to have a Material Adverse Effect or (ii) relating to or which challenges the validity or propriety of the Transactions. The Bank is not subject to any order, judgment or decree of a Governmental Entity that, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect. Except as set forth in Section 3.01(i) of the Bank Disclosure Schedule and except as, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect, (i) there is no unresolved violation, criticism or exception by any Governmental Entity with respect to any Report or relating to any examinations or inspections of the Bank and (ii) since January 1, 2006, there has been no formal or informal inquiries by, or disagreements or disputes with, any Governmental Entity with respect to the business, operations, policies or procedures of the Bank. Notwithstanding the foregoing, Purchaser acknowledges that the Bank has fully disclosed to Purchaser, its counsel and other advisors, that on January 10, 2008 and on July 8, 2008, the Bank entered into two Memorandum of Understandings with the FDIC

(j) ERISA.

(i)     All "employee benefit plans, as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA ), that are subject to Title I of ERISA and are currently maintained or maintained since January 1, 2003, by either the Bank or any companies which, with the Bank, would be deemed to be a single employer under Section 414(b), (c), (m) or (o) of the Code (collectively, the "Bank Group ) for the benefit of the Bank Group employees, are collectively, for purposes of this Agreement, referred to herein as the "Bank Plans. All Bank Plans that constitute employee "pension plans as defined in Section 3(2) of ERISA that are subject to Title IV of ERISA are referred to herein as the "Bank Pension Plans. Except as, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect, no non-exempt "prohibited transaction (as such term is used in Section 406 of ERISA or Section 4975 of the Code), has heretofore occurred with respect to any Bank Plan or any Bank Pension Plan and, to the knowledge of the Bank, no such non-exempt prohibited transaction with respect to any Bank Plan or Bank Pension Plan shall occur as a result of the execution and delivery of this Agreement or the Ancillary Documents and the consummation of the Transactions.

(ii)     The consummation of the transactions contemplated hereby will not result in a material increase in the amount of, or acceleration in the timing of payment or vesting of, any material compensation payable or awarded by the Bank to any of its employees under any employment agreements, plans or programs of the Bank.

(iii)     The Bank is a party to the Idaho First Bank 401(K) Employee Stock Option Plan (the "KSOP ). The Bank submitted the KSOP to the IRS for a determination letter that the KSOP was a qualified plan. The IRS responded by declining to review the KSOP for procedural reasons, i.e., the KSOP was submitted during an off-cycle year. The Bank's cycle year is February 1, 2009 through January 31, 2010. The Bank's KSOP had not been qualified as of the date of the Agreement.

(k) Taxes. Except as, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect:

(i)      the Bank has duly and timely filed (including all applicable extensions) all Tax Returns required to be filed by it on or prior to the date hereof (all such returns being accurate, true and complete in all material respects), has paid all Taxes due (whether or not shown on any Tax Return) and has duly paid or made provision for the payment of all Taxes that have been incurred or are due or claimed to be due from it by federal, state, foreign or local taxing authorities other than Taxes that are not yet delinquent or are being contested in good faith, have not been finally determined and have been adequately reserved against;

(ii)     to the knowledge of the Bank, the federal, state and local income Tax returns of the Bank have not been examined by the Internal Revenue Service (the "IRS ) and any applicable state and local tax authorities for all years to and including 2008 and any liability with respect thereto has been satisfied or any liability with respect to deficiencies asserted as a result of such examination is covered by reserves that are adequate under GAAP;

(iii)    there are no disputes pending, or claims asserted, for Taxes or assessments upon the Bank for which the Bank does not have reserves that are adequate under GAAP;

(iv)     the Bank has withheld and paid all Taxes required to be withheld and paid in connection with amounts paid and owing to any employee, independent contractor, creditor, stockholder or other third party (whether domestic or foreign);

(v)      there are no liens for Taxes (other than Taxes not yet due and payable) upon any assets of the Bank;

(vi)     the Bank is not (A) a party to or is bound by any Tax sharing, allocation or indemnification agreement or arrangement or (B) has any liability for the Taxes of any Person (other than the Bank) under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or foreign law);

(vii)    within the past two years, the Bank has not been a "distributing corporation or a "controlled corporation in a distribution intended to qualify under Section 355(a) of the Code;

(viii)   the Bank is not required to include in income any adjustment pursuant to Section 481(a) of the Code, no such adjustment has been proposed by the IRS and no pending request for permission to change any accounting method has been submitted by the Bank; and

(ix)     the Bank has not participated in a "listed transaction within the meaning of Treasury Regulation Section 1.6011-4(b)(2).

(l)      Intellectual Property. Except as, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect:

(i)     the Bank owns, or is licensed to use (in each case, free and clear of any claims, liens or encumbrances), all Intellectual Property used in or necessary for the conduct of its business as currently conducted;

(ii)    the use of any Intellectual Property by the Bank does not, to the knowledge of the Bank, infringe on or otherwise violate the rights of any person and is in accordance with any applicable license pursuant to which the Bank acquired the right to use any Intellectual Property;

(iii)   no person is challenging, infringing on or otherwise violating any right of the Bank with respect to any material Intellectual Property owned by or licensed to the Bank;

(iv)    to the knowledge of the Bank, the Bank has not received any notice of any pending claim with respect to any Intellectual Property used by the Bank; and

(v)     to the knowledge of the Bank, no Intellectual Property owned or licensed by the Bank is being used or enforced in a manner that would be expected to result in the abandonment, cancellation or unenforceability of such Intellectual Property.

(m)Environmental Liability.  Except as, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect:

(i)     there are no legal, administrative, arbitral or other proceedings, claims, actions, causes of action or notices with respect to any environmental, health or safety matters or any private or governmental environmental, health or safety investigations or remediation activities of any nature seeking to impose, or that are reasonably likely to result in, any liability or obligation of the Bank arising under common law or under any local, state or federal environmental, health or safety statute, regulation or ordinance, including the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, pending or threatened against the Bank;

(ii)    to the knowledge of the Bank, there is no reasonable basis for, or circumstances that are reasonably likely to give rise to, any such proceeding, claim, action, investigation or remediation by any Governmental Entity or any third party that would give rise to any liability or obligation on the part of the Bank; and

(iii)   the Bank is not subject to any agreement, order, judgment, decree, letter or memorandum by or with any Governmental Entity or third party imposing any liability or obligation with respect to any of the foregoing.

(n) Mortgage Banking Business.  Except as, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect, the Bank has complied with, and all documentation in connection with the origination, processing, underwriting and credit approval of any real estate secured loans originated, purchased or serviced by the Bank has satisfied all applicable federal, state and local laws, rules and regulations with respect to the origination, insuring, purchase, sale, pooling, servicing, subservicing, or filing of claims in connection with such loans, including all laws relating to real

-16-

estate settlement procedures, consumer credit protection, truth in lending laws, usury limitations, fair housing, transfers of servicing, collection practices, equal credit opportunity and adjustable rate mortgages.

(o) Regulatory Actions. Except as set forth in Section 3.01(o) of the Bank Disclosure Schedule, the Bank has not received any written communication from any Bank Regulator (i) asserting that it is in material violation of any law, (ii) threatening to revoke any of its material permits or licenses, (iii) requiring it (x) to enter into or consent to the issuance of a cease and desist order, written agreement, consent decree, directive, commitment or memorandum of understanding, or (y) to adopt any policy, procedure or resolution of its Board of Directors or similar undertaking, that restricts the conduct of its business, or relates to its capital adequacy, its credit or reserve policies, it management, or the payment of dividends or any other policy or procedure, in either case, that would be material to the conduct of the business or the Bank or (iv) threatening or contemplating revocation or limitation of, or which would have the effect of revoking or limiting, FDIC deposit insurance, and the Bank has not received any written notice from a Bank Regulator that it is considering issuing or requiring any of the foregoing. The Bank has filed all reports and statements, together with any amendment required to be made with respect thereto, that it was required to file with any Bank Regulator, and has paid all fees and assessments due and payable in connection with its business.

(p) Bank Information. None of the information to be contained in any document filed with any regulatory agency in connection with the transactions contemplated by this Agreement (the "Regulatory Filings" ), in each case, other than Purchaser Information, as to which no representation is made by the Bank, will, at the time such filing is made, contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances in which they are made, not misleading.

(q) Vote Required; State Takeover Laws. Except for the Stockholder Approval, no other vote or consent of the holders of any Common Stock is required by Law, by the Restated Articles of Incorporation or Bylaws of the Bank or otherwise, to approve and adopt this Agreement or the Transactions contemplated hereby. No state anti-takeover statute, similar statute or regulation or anti-takeover provision in the Restated Articles of Incorporation or Bylaws of the Bank is applicable to this Agreement or the Transactions contemplated hereby. The Bank is not a party to any "stockholder rights plan or similar anti-takeover plan or device.

(r) Solvency. Immediately after giving effect to all of the Transactions contemplated by this Agreement, including payment of all related fees and expenses, the Bank will be Solvent. For purposes of this Section 3.01, the term "Solvent with respect to the Bank means that, as of any date of determination, (a) the Bank will not have, as of such date, an unreasonably small amount of capital for the operation of the business in which the Bank is engaged as a going concern following such date on an individual basis; and (b) the Bank will have sufficient assets and cash flow to pay each of their respective Stated Liabilities and other Contingent Liabilities as they mature or otherwise become due on an individual basis. For purposes of this Section 3.01, the term "Stated Liabilities means all known liabilities and recorded liabilities (including Contingent Liabilities that would be recorded in accordance with GAAP consistently applied) of the Bank and the term "Contingent Liabilities means the

-17-

maximum estimated amount of liability reasonably likely to result from pending litigation, asserted claims and assessments, guaranties, uninsured risks and other contingent liabilities of the Bank.

(s) <u>Status of Securities</u>. The Securities have been duly authorized by all necessary corporate action. When issued as contemplated by this Agreement, the Securities will be validly issued, fully paid and nonassessable, will not subject the holders thereof to personal liability and will not be subject to preemptive rights of any other Stockholder of the Bank.

(t) <u>Offering of Securities</u>. Neither the Bank nor any Person acting on its behalf has offered the Securities or any similar securities of the Bank for sale to, solicited any offers to buy any of the Securities or any similar securities of the Bank from or otherwise approached or negotiated with respect to any of the Securities or any similar securities of the Bank with any Person other than Purchaser. Neither the Bank nor any Person acting on its behalf has taken or will take any action (including, without limitation, any offering of any equity securities of the Bank under circumstances which would require the integration of such offering with the offering of any of the Securities under the Securities Act and the rules and regulations of the SEC thereunder) which might subject the offering, issuance or sale of any of the Securities to the registration requirements of the Securities Act.

(u) <u>Brokers and Finders</u>. Neither the Bank nor any of its respective officers, directors, employees or agents has utilized any broker, finder, placement agent or financial advisor or incurred any liability for any fees or commissions in connection with any of the Transactions.

(v) <u>Capital</u>. Pro forma for the Transactions and projected as of June 30, 2009, the Bank's bank capital position will exceed the regulatory capital standards to maintain "Well Capitalized status within the meaning of 12 U.S.C. 1831(o) (as in effect on the date hereof) as determined by the Bank's principal federal banking agency or the FDIC, but in no event, less than the amount required in a capital directive from a federal banking agency.

(w) <u>Loan Portfolio</u>.

(i)    To the knowledge of the Bank, the allowance for loan losses shown on the balance sheets in the Most Recent Unaudited Financial Statements was or will be, as the case may be, adequate, as of the dates thereof, under GAAP.

(ii)    Section 3.01(w) of the Bank Disclosure Schedule sets forth a listing, as of the most recently available date (and in no event later than March 31, 2009), by account, of: (A) all loans (including loan participations) of the Bank that have been accelerated during the past twelve (12) months; (B) all loan commitments or lines of credit of the Bank which have been terminated by the Bank during the past twelve (12) months by reason of a default or adverse developments in the condition of the borrower or other events or circumstances affecting the credit of the borrower; (C) all loans, lines of credit and loan commitments as to which the Bank has given written notice of its intent to terminate during the past twelve (12) months; (D) with respect to all commercial loans (including commercial real estate loans), all such loans for which there has been distributed notification letters and other

-18-

written communications from the Bank to any of its respective borrowers, customers or other parties during the past twelve (12) months wherein the Bank has requested or demanded that actions be taken to correct existing defaults or facts or circumstances which may become defaults; (E) each borrower, customer or other party which has notified the Bank during the past twelve (12) months of, or has asserted against the Bank, in each case in writing, any "lender liability or similar claim; (F) all loans, (1) that are contractually past due ninety (90) days or more in the payment of principal and/or interest, (2) that are on non-accrual status, (3) that as of the date of this Agreement are classified as "Other Loans Specially Mentioned, "Special Mention, "Substandard, "Doubtful, "Loss, "Classified, "Criticized, "Watch list or words of similar import, together with the principal amount of and accrued and unpaid interest on each such loan and the identity of the obligor thereunder, (4) where a reasonable doubt exists as to the timely future collectability of principal and/or interest, whether or not interest is still accruing or the loans are less than ninety (90) days past due, (5) where, during the past three (3) years, the interest rate terms have been reduced and/or the maturity dates have been extended subsequent to the agreement under which the loan was originally created due to concerns regarding the borrower's ability to pay in accordance with such initial terms, or (6) where a specific reserve allocation exists in connection therewith; and (G) all assets classified by the Bank as real estate acquired through foreclosure or in lieu of foreclosure, including in-substance foreclosures, and all other assets currently held that were acquired through foreclosure or in lieu of foreclosure. Section 3.01(w) of the Bank Disclosure Schedule may exclude any individual loan with a principal outstanding balance of less than $50,000, provided that said Schedule includes, for each category described, the aggregate amount of individual loans with a principal outstanding balance of less than $50,000 that has been excluded.

(iii)     All loans receivable (including discounts) and accrued interest entered on the books of the Bank arose out of bona fide arm's-length transactions, were made for good and valuable consideration in the ordinary course of the Bank's respective business, and the notes or other evidences of indebtedness with respect to such loans (including discounts) are true and genuine and are what they purport to be, except as set forth in Section 3.01(w) of the Bank Disclosure Schedule. To the knowledge of the Bank, the loans, discounts and the accrued interest reflected on the books of the Bank are subject to no defenses, set-offs, recoupments or counterclaims (including, without limitation, those afforded by usury or truth-in-lending laws), except as may be provided by bankruptcy, insolvency or similar laws affecting creditors' rights generally or by general principles of equity. Except as set forth in Section 3.01(w) of the Bank Disclosure Schedule, all such loans are owned by the Bank free and clear of any liens.

(iv)     The notes and other evidences of indebtedness evidencing the loans described above, and all pledges, mortgages, deeds of trust and other collateral documents or security instruments relating thereto are, in all material respects, valid, true and genuine, and what they purport to be.

(x) <u>Risk Management Instruments</u>.  All material interest rate swaps, caps, floors, option agreements, futures and forward contracts and other similar risk management arrangements, whether entered into for the Bank's own account, or for the account of its customers (all of which are set forth in Section 3.01(x) of the Bank Disclosure Schedule), were in all material respects entered into in compliance with all applicable laws, rules, regulations and regulatory policies, and with counterparties believed to be financially responsible at the time; and

to the knowledge of the Bank each of them constitutes the valid and legally binding obligation of the Bank, enforceable in accordance with its terms (except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar laws of general applicability relating to or affecting creditors' rights or by general equity principles), and is in full force and effect. Neither the Bank, nor to the knowledge of the Bank any other party thereto, is in breach of any of its obligations under any such agreement or arrangement in any material respect.

(y) Relationships with Affiliates. Except as set forth in Section 3.01(y) of the Bank Disclosure Schedule, no Stockholder owning of record or beneficially owning 5% or more of the issued and outstanding Common Stock on a fully diluted basis, or any Affiliate of any such Stockholder, (a) has any interest in any property (real, personal, or mixed and whether tangible or intangible), used in or pertaining to the business of the Bank as currently conducted or contemplated to be conducted, (b) excluding the ownership of less than 5% of the outstanding common stock of a publicly-held corporation, owns of record or as a beneficial owner, an equity interest or any other financial or profit interests in a Person that has had business dealings or a material financial interest in any transaction with the Bank, or (c) is a party to any contract (except for employment and similar agreements) with the Bank, including with respect to compensation or remuneration to be paid to such Stockholder or Affiliate in connection with this Agreement or the Transactions.

(z) Indebtedness to and from Officers and Directors of the Bank. The Bank is not indebted, directly or indirectly, to any Person who is (a) a Stockholder owning of record or beneficially owning 3% or more of the issued and outstanding Common Stock on a fully diluted basis, (b) an Executive Officer, or (c) a director of the Bank in any amount whatsoever, other than for salaries for services rendered or reimbursable business expenses, nor is any such Stockholder, officer or director indebted to the Bank, except as set forth in Section 3.01(z) of the Bank Disclosure Schedule and for advances made to employees of the Bank in the ordinary course of business to meet reimbursable business expenses reasonably anticipated to be incurred by such obligor consistent with past practice.

Section 3.02. Representations and Warranties of Purchaser. Purchaser represents and warrants to the Bank, as of the date hereof and as of the Closing Date (or as of such specific date in the case of any representation or warranty expressly made as of a specific date) as follows:

(a) Organization. Purchaser is duly organized, validly existing and in good standing under the laws of the state or country of its jurisdiction of formation and has all requisite power and authority to own, operate and lease its properties and to carry on its business as it is being conducted on the date of this Agreement.

(b) Authorization; No Conflicts.

(i) Purchaser has full power and authority to execute and deliver this Agreement and the Ancillary Documents to which it is or will be a party and to consummate the Transactions. The execution, delivery and performance by Purchaser of this Agreement and each of the Ancillary Documents to which it is or will be a party and the consummation of the Transactions have been duly authorized by all necessary action on behalf of Purchaser. No other

-20-

proceedings on the part of Purchaser are necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and each Ancillary Document and consummation of the Transactions. This Agreement has been, and on or prior to the Closing Date each Ancillary Document to which it is a party will be, duly and validly executed and delivered by Purchaser. This Agreement is, and upon its execution at or prior to the Closing Date each Ancillary Document to which it is or will be a party will be, a valid and binding obligation of Purchaser, enforceable against it in accordance with its terms.

(ii)    The execution, delivery and performance of this Agreement and the Ancillary Documents to which it is or will be a party, the consummation by Purchaser of the Transactions and the compliance by Purchaser with any of the provisions hereof and thereof will not conflict with, violate or result in a breach of any provision of, or constitute a default (or an event, which, with notice or lapse of time or both would constitute a default) under, or result in the termination of or accelerate the performance required by, or result in a right of termination or acceleration under, (A) any provision of the governing documents of Purchaser or (B) any mortgage, note, indenture, deed of trust, lease, loan agreement or other agreement or instrument of Purchaser or any permit, concession, grant, franchise, license, judgment, order, decree, ruling, injunction, statute, law, ordinance, rule or regulation applicable to Purchaser or its properties or assets other than any such conflict, violation, breach, default, termination and acceleration under clause (B) that, individually or in the aggregate, would not reasonably be expected to materially and adversely affect or delay the consummation of the Transactions.

(c) <u>Consents and Approvals</u>.  Except for any consent, approval, action or filing the absence of which would not have, or reasonably be expected to have, a material adverse affect on Purchaser's ability to consummate the Transactions or the Bank, no consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Entity is required on the part of Purchaser in connection with the execution, delivery and performance by Purchaser of this Agreement and the Ancillary Documents to which it is or will be a party and the consummation by Purchaser of the Transactions.

(d) <u>Securities Act</u>.  Purchaser is acquiring the Securities solely for the purpose of investment and not with a view to, or for resale in connection with, any distribution thereof in violation of the Securities Act.

(e) <u>Brokers and Finders</u>.  Neither Purchaser nor any of its officers, directors, employees or agents has utilized any broker, finder, placement agent or financial advisor or incurred any liability for any fees or commissions in connection with any of the Transactions.

(f) <u>Purchaser Information</u>.  None of the information with respect to Purchaser and its Affiliates or any of their respective officers and directors that is provided to the Bank by Purchaser or any of its representatives (collectively, "<u>Purchaser Information</u> ) specifically for inclusion in any of the Regulatory Filings, will, at the time such filing is made, contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances in which they are made, not misleading.

(g) No other Representations. Purchaser is an informed and sophisticated purchaser, and has engaged to the extent it deemed appropriate expert advisors experienced in the evaluation of transactions of the type contemplated hereby. Purchaser acknowledges that it has not relied upon any express or implied representations or warranties of any nature made by or on behalf of or imputed to the Bank, except as expressly set forth in this Agreement or the Ancillary Documents. Without limiting the generality of the foregoing, Purchaser acknowledges that the Bank makes no representation or warranty with respect to (i) any projections, estimates or budgets delivered to or made available to Purchaser of future revenues, future results of operations (or any component thereof), future cash flows or future financial condition (or any component thereof) of the Bank and its Subsidiaries or the future business and operations of the Bank and its Subsidiaries or (ii) any other information or documents made available to Purchaser or its counsel, accountants or advisors with respect to the Bank or its Subsidiaries or their respective businesses or operations, except as expressly set forth in this Agreement, the Ancillary Documents and the schedules hereto and thereto. Purchaser hereby represents that it (either alone or together with its advisors) is capable of evaluating the risks associated with the Transactions and the Bank, including the risk of transacting on the basis of inferior information, and that Purchaser is capable of sustaining any loss resulting therefrom without material injury.

## ARTICLE IV

### Additional Agreements of the Parties

Section 4.01. Taking of Necessary Action; Other Actions. Subject to the terms and conditions hereof, (i) each of the parties hereto agrees to use all reasonable best efforts promptly to take or cause to be taken all action and promptly to do or cause to be done all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the Transactions, and (ii) each party shall execute and deliver both before and after the Closing such further certificates, agreements and other documents and take such other actions as the other party may reasonably request to consummate or implement the Transactions or to evidence such events or matters.

Section 4.02. Financial Statements and Other Reports. Subject to Section 4.02(c), the Bank covenants that from and after the date hereof and following the Closing Date, for so long as Purchaser owns shares of the Securities or Common Stock, it will deliver to Purchaser:

(a) within 5 days after delivery to a Bank Regulator, a copy of the Consolidated Report of Conditions and Income filed with such Bank Regulator at the end of each quarterly period; and

(b) within 75 days after the end of each fiscal year, a consolidated balance sheet of the Bank as of the end of such fiscal year and the related consolidated statements of income, changes in stockholders' equity and cash flows for such fiscal year, together with the audit report of Moss & Adams LLP or other independent public accountants of recognized standing selected by the Bank.

(c) Following the Closing, the obligations of the Bank with respect to Purchaser set forth in this Section 4.02 shall terminate and no longer be of any effect from and after such

-22-

time as Purchaser no longer owns an amount greater than or equal to 10% of the amount of Securities purchased by Buyer or Common Stock into which such Securities has been converted.

Section 4.03.  Conduct of the Business.

(a) Except with the prior written consent of Purchaser (which consent shall not be unreasonably withheld or delayed) or as required by law, expressly contemplated by this Agreement or set forth in Section 4.03 of the Bank Disclosure Schedule, prior to the earlier of the Closing Date and the termination of this Agreement pursuant to Section 6.04 (the "Pre-Closing Period ), the Bank shall use reasonable best efforts to carry on its business in the ordinary course of business and use reasonable best efforts to maintain and preserve its business (including its organization, assets, properties, goodwill and insurance coverage) and preserve its business relationships with customers, strategic partners, suppliers, distributors and others having business dealings with it; provided, that nothing in this sentence shall limit or require any actions that the Board of Directors may, in good faith, determine to be inconsistent with the Bank's obligations under applicable law.

(b) Except as required by law, expressly contemplated by this Agreement or set forth in Section 4.03 of the Bank Disclosure Schedule, from the date hereof unless this Agreement is otherwise terminated pursuant to Section 6.04, the Bank shall not without the prior written consent of Purchaser:

(i) declare, accrue, set aside or pay any dividend or make any other distribution in respect of any shares of capital stock, split, combine or reclassify any capital stock or repurchase, redeem or otherwise reacquire, directly or indirectly, any shares of capital stock or other equity securities, other than repurchases from employees of the Bank following termination of employment pursuant to the terms of applicable pre-existing restricted stock agreements;

(ii) sell, issue, grant deliver or authorize the sale, issuance, delivery or grant of: (A) any capital stock or other security; (B) any option, call, warrant or right to acquire any capital stock or other security; or (C) any instrument convertible into or exchangeable for any capital stock or other security;

(iii) declare or pay any non-cash dividend or make any non-cash distribution in respect of any equity securities of the Bank;

(iv) amend the Restated Articles of Incorporation, the Bylaws or any of the Bank's other governing documents;

(v) effect or become a party to any merger, consolidation, share exchange, business combination, amalgamation, recapitalization, reclassification of shares, stock split, reverse stock split, division or subdivision of shares, consolidation of shares or similar transaction;

(vi) form any Subsidiary or acquire, outside the ordinary course of business, any material equity interest or other material interest in any other Person;

(vii)   (A) enter into or become bound by, or permit any of the assets owned or used by it to become bound by, any material contract or (B) amend or terminate, or waive or exercise any material right or remedy under, any material contract;

(viii)   enter into, renew or become bound by, or permit any of the assets owned or used by it to become bound by, any contract the effect of which would be to grant to any Person following the consummation of the Transactions contemplated by this Agreement any actual or potential right or license to any Intellectual Property owned as of the date of this Agreement by the Bank;

(ix)   enter into, renew or become bound by, or permit any of the assets owned or used by it to become bound by, any contract containing, or otherwise subjecting the Bank or its Affiliates to, any non-competition, exclusivity or other material restriction on the operation of the business of the Bank or its Affiliates;

(x)   acquire, lease or license any right or other asset from any other Person or sell or otherwise dispose of, lease or license any right or other asset to any other Person (except in each case for assets that are not material individually or in the aggregate) acquired, leased, licensed or disposed of by the Bank in the ordinary course of business and consistent with past practices), or, other than in the ordinary course of business in connection with the collection of loans, waive or relinquish any material right;

(xi)   other than in the ordinary course of business consistent with past practices, (A) make any pledge of any of its material assets or (B) permit any of its material assets to become subject to any Encumbrances, except for Encumbrances that do not materially detract from the value of such assets or materially impair the operations of the Bank;

(xii)   other than in the ordinary course of business consistent with past practices, lend money to any Person;

(xiii)   incur or guarantee any indebtedness (including capital lease obligations) (other than indebtedness for reimbursement of expenses made in the ordinary course of business) or obtain or enter into any bond or letter of credit or any related contract;

(xiv)   except as set forth on Schedule 4.03, (x) establish, adopt, enter into or amend any of the Bank's employee benefit plans or employment agreements, (y) increase the amount of the wages, salary, commissions, fringe benefits or other compensation (including equity-based compensation, whether payable in stock, cash or other property) or remuneration payable to, its employees, or (z) pay any bonus or make any profit sharing or similar payment to any of its directors or any of its Executive Officers;

(xv)   hire, commit to hire, or enter into an employment agreement with any person for an annual salary greater than $50,000;

(xvi)   other than in the ordinary course of business consistent with past practices, materially change any of its pricing policies, lending policies, approval policies, service policies, investment policies, asset/liability management policies, personnel policies or

-24-

other business policies, or any of its methods of accounting or accounting practices (other than as required by GAAP) in any respect;

        (xvii)  establish, adopt or amend any investment policy of the Bank, make any investment that is inconsistent with any investment policy of the Bank;

        (xviii)  enter into, cancel, amend or terminate any insurance policies (other than any such policies that are immediately replaced with substantially similar policies);

        (xix)  make any material Tax election, amend or file a claim for refund with respect to any Tax Return, compromise or settle any legal proceeding with respect to any Tax or Tax-related matter, enter into or obtain any Tax ruling or take any action that would reasonably be expected to have a material and adverse impact on the Tax liability of the Bank, except as required under applicable law;

        (xx)  commence any legal proceeding other than legal proceedings commenced in connection with routine loan collection or foreclosure proceedings;

        (xxi)  settle any claim or legal proceeding other than claims or legal proceedings against the Bank that do not relate to Tax or Tax-related matters and with respect to which the settlement involves solely the payment by the Bank of an amount less than $100,000 in the aggregate for all such claims and legal proceedings settled during the Pre-Closing Period; or

        (xxii)  agree or commit to take any of the foregoing actions.

Section 4.04.  Inspection of Property.  The Bank covenants that it will permit representatives of Purchaser to visit and inspect, at Purchaser's expense, any of the properties of the Bank to examine the corporate books and make copies or extracts therefrom and to discuss the affairs, finances and accounts of the Bank with the principal officers of the Bank, all upon reasonable notice and at such reasonable times as often as Purchaser may reasonably request. Any investigation pursuant to this Section 4.04 shall be conducted during normal business hours and in such manner as not to interfere unreasonably with the conduct of the business of the Bank, and nothing herein shall require the Bank to disclose any information to the extent (a) that the Bank reasonably believes such information to be competitively sensitive proprietary information (except to the extent Purchaser provides reasonable assurances that such information shall not be shared with employees of its or its Affiliates' competing businesses or otherwise used by the Purchaser or its Affiliates to compete with the Bank), (b) prohibited by applicable law or regulation, or (c) that such disclosure would reasonably be expected to cause a violation of any agreement to which the Bank is a party or would cause a risk of a loss of privilege to the Bank (*provided* that the Bank shall use reasonable best efforts to make appropriate substitute disclosure arrangements under circumstances where the restrictions in this clause (c) apply). Purchaser agrees that it will conduct any inspection under this Section 4.04 in compliance with the regulatory requirements of the Gramm-Leach-Bliley Act of 1999, 15 U.S.C. §§ 6801 *et seq.*

Section 4.05.  Securities Laws; Legends; Transferability.

(a) Purchaser acknowledges and agrees that as of the date hereof and as of the Closing Date the Securities issuable pursuant to this Agreement shall not have been registered under the Securities Act or the securities laws of any state.

(b) Purchaser further acknowledges and agrees that each certificate for the Securities shall bear the following legend:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE SUCH A REGISTRATION IS IN EFFECT UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.

(c) When issued pursuant hereto, the certificates evidencing the Securities shall also bear any legend required by any applicable state blue sky law.

(d) Any holder of the Securities may request the Bank to remove the legend described herein from the certificates evidencing such Securities by submitting to the Bank such certificates, together with an opinion of counsel reasonably satisfactory to the Bank to the effect that such legend is no longer required under the Securities Act.

Section 4.06.  Lost, Stolen, Destroyed or Mutilated Securities.  Upon receipt of evidence satisfactory to the Bank of the loss, theft, destruction or mutilation of any certificate for any security of the Bank and, in the case of loss, theft or destruction, upon delivery of an undertaking by the holder thereof to indemnify the Bank (and, if requested by the Bank, the delivery of an indemnity bond sufficient in the judgment of the Bank to protect the Bank from any loss it may suffer if a certificate is replaced), or, in the case of mutilation, upon surrender and cancellation thereof, the Bank will issue a new certificate for an equivalent number of shares or another security of like tenor, as the case may be.

Section 4.07.  Regulatory Matters.

(a) Purchaser and the Bank will (i) following the date of this Agreement file all applications and notices as are necessary to obtain all required Regulatory Approvals for the consummation of the Transactions (provided that Purchaser shall file its initial application to the FRB, and the Bank shall provide the required notice to the FDIC with respect to the proposed new directors of the Bank, on or prior to June 1, 2009); (ii) proceed in good faith and use commercially reasonable efforts to obtain all consents or approvals of, to make all filings with, and give all notices to, any Bank Regulator required to consummate the Transactions and (iii) provide such information to such Bank Regulator as such Bank Regulator reasonably requests in connection therewith.  To the extent practicable, each of the Bank and Purchaser will consult with the other on, in each case subject to applicable laws relating to the confidentiality of information, any filing or application made with any Governmental Entity in connection with the transactions contemplated by this Agreement.  In exercising the foregoing right, each of the

parties shall act reasonably. The parties shall consult with each other with respect to the obtaining of all permits, consents, approvals and authorizations of all third parties and Governmental Entities necessary or advisable to consummate the transactions contemplated by this Agreement and each party will keep the other apprised of the status of matters relating to completion of the transactions contemplated by this Agreement.

(b) The Bank and Purchaser shall, upon request, furnish each other with such information concerning themselves, their directors, officers and equityholders and such other matters as may be reasonably necessary or advisable in connection with any filing or application made by or on behalf of Purchaser or any of its Subsidiaries or the Bank to any Governmental Entity in connection with the Transactions (other than information that must be kept confidential under applicable law).

(c) Each of the Purchaser and the Bank shall promptly advise the other upon receiving any communication from any Governmental Entity, the consent or approval of which is required for consummation of the Transactions, that causes such party to believe that there is a reasonable likelihood that any Regulatory Approval will not be obtained or that the receipt of any such approval may be materially delayed.

Section 4.08.   Board of Directors.

(a) Effective as of the Closing Date, the Board of Directors of the Bank shall appoint to the Board two nominees of Purchaser to serve as directors on the Board of Directors until the Bank's annual meeting at which such director's term expires (each, a "Board Representative" ), which appointments shall be made in accordance with applicable law. Beginning with such annual meeting of the Bank's stockholders or at any meeting of the stockholders of the Bank at which the directors of the Board of Directors of the Bank are to be elected, the Bank will include in the slate of directors recommended for election by the Board of Directors to the stockholders of the Bank the Board Representatives, and will use its reasonable best efforts to take all action necessary (including the solicitation of proxies on such person's behalf) to ensure such persons are elected by the stockholders of the Bank as  directors of the Bank's Board of Directors. So long as the Board Representatives are serving on the Board of Directors, the Board Representatives shall also be appointed to any committees of the Board of Directors.

(b) In the event of resignation, death, removal or disqualification of a director nominated by Purchaser in accordance with Section 4.08(a) and subsequently elected to the Bank's Board of Directors, Purchaser shall promptly designate a replacement director, and the Bank will use its reasonable best efforts to take all action necessary (including the solicitation of proxies on such person's behalf) to ensure such person is elected by the stockholders of the Bank to the Bank's Board of Directors at the next meeting of the Bank's stockholders at which Class III directors are elected.

Section 4.09.   Recommendation; No-Shop.

(a) As promptly as practicable following the date hereof, the Bank shall prepare and cause to be mailed to its stockholders a proxy statement related to the Stockholder Approval

(the "Proxy Statement ) for the purpose of obtaining the Stockholder Approval. Prior to mailing the Proxy Statement (or any amendment or supplement thereto), the Bank (i) shall provide Purchaser an opportunity to review and comment on such document and (ii) shall take into consideration all comments reasonably proposed by Purchaser. The Bank shall, as soon as practicable after the date of this Agreement (but in any event, within forty-five (45) days) establish a record date, give notice of, call, convene, and hold a special meeting of its shareholders to vote on the Transactions (the "Stockholder Meeting ). The Board of Directors shall recommend to the Bank's Stockholders that such Stockholders vote in favor of the Transactions and the matters requiring Stockholder Approval (the "Recommendation ), which obligation shall be subject to and conditioned on the Bank receiving a Fairness Opinion by May 30th, 2009. In the event the Bank fails to receive the Fairness Opinion by May 30th, 2009, Purchaser shall have the right to terminate this Agreement by providing written notice to the Bank in accordance with Section 6.04(i). Unless the Board of Directors has changed its Recommendation pursuant to its fiduciary duties under applicable law and in compliance with Section 4.09(c), the Board of Directors shall use its reasonable best efforts to secure the Stockholder Approval.

(b) The Bank agrees that, following the date of this Agreement and prior to the earlier of the Closing Date or the date on which this Agreement is terminated pursuant to Section 6.04 hereof, it shall not, and it shall use reasonable efforts to cause its officers, directors, employees, advisors and agents not to, directly or indirectly, (i) knowingly solicit or initiate any Acquisition Proposal, (ii) provide any non-public information or data to any Person relating to or in connection with a Acquisition Proposal, (iii) approve, recommend, agree to or accept, or propose publicly to approve, recommend, agree to or accept, any Acquisition Proposal, or (iv) approve, recommend, agree to or accept, or propose to approve, recommend, agree to or accept, or execute or enter into, any letter of intent, agreement in principle, merger agreement, acquisition agreement, option agreement or other similar agreement related to any Acquisition Proposal. The Bank agrees that it will immediately cease and cause to be terminated any existing activities, discussions or negotiations with any Persons conducted heretofore with respect to any Acquisition Proposal (except with respect to the Transactions contemplated by this Agreement).

(c) Notwithstanding Section 4.09(a) and (b), at any time prior to the receipt of Stockholder Approval, and as long as there has not been a material or intentional failure to comply with any of the obligations under this Section 4.09 with respect to the Transactions, the Board of Directors may withdraw, modify, qualify or change its Recommendation or make a new Recommendation so as to recommend a Superior Proposal to the Bank's shareholders if (i) Purchaser shall have been provided by the Bank prompt written notice of (x) the Board of Directors' intention to take the action referred to in the preceding sentence and (y) the material terms and conditions of the Acquisition Proposal constituting a Superior Proposal, including the identity of the party making such Acquisition Proposal and, if available, a copy of the relevant proposed transaction agreements with such party and other material documents, (ii) the Bank shall have given Purchaser a period of four (4) Business Days after delivery of such notice to review the proposed transaction agreements and to propose revisions to the terms of this Agreement (or make another proposal) and shall have considered and discussed in good faith with Purchaser any such proposed revisions or other proposal, if any and (iii) the Board of Directors shall have determined in good faith, after considering the results of such considerations

-28-

and discussions and giving effect to the proposals made by Purchaser, if any, and after consultation with its outside legal counsel, that such Acquisition Proposal remains a Superior Proposal; provided, further that in the event the Board of Directors does not make the determination referred to in clause (iii) of this paragraph but thereafter determines to withdraw, modify, qualify or change the Recommendation or make a new Recommendation pursuant to this Section 4.09, the procedures referred to in clauses (i), (ii) and (iii) shall apply anew and shall also apply to any subsequent withdrawal, modification, qualification or change.

(d) For purposes of this Agreement:

(i) "Acquisition Proposal means any bona fide inquiry, proposal, request or offer from any Person relating to (A) any direct or indirect acquisition or purchase of a business or assets that constitutes 15% or more of the net revenues, net income or the assets (including equity securities) of the Bank, taken as a whole, (B) any direct or indirect acquisition or purchase of 15% or more of any class of voting securities of the Bank, (C) any tender offer or exchange offer that if consummated would result in any Person beneficially owning 15% or more of any class of voting securities of the Bank, or (D) any merger, consolidation, business combination, recapitalization, liquidation, dissolution or similar transaction involving the Bank, other than the transactions contemplated by this Agreement.

(ii) "Superior Proposal means any written bona fide offer with respect to an Acquisition Proposal (substituting 75% for 15% in the definition thereof) that (A) the Board of Directors determines in good faith, after consultation with its independent financial and legal advisors, constitutes or is reasonably likely to lead to an Acquisition Proposal that, if consummated would result in a transaction that would be more favorable, from a financial point of view, to the Stockholders than the Transactions (taking into account the likelihood of consummation, the form and amount of consideration offered and all other terms of the proposal or offer, as well as any alterations to this Agreement proposed by Purchaser in response thereto and any other factors deemed relevant by the Board of Directors of the Bank), (B) the Board of Directors of the Bank has concluded, in good faith and after considering the advice of nationally recognized outside legal counsel, that the failure to take such action would be inconsistent with its fiduciary duties under applicable law and (C) either is not subject to a financing contingency or for which written financing commitments from credible financing sources have been provided.

Section 4.10.  Registration Rights.  At any time following the date hereof, if the Bank proposes to register any equity securities of the Bank or any holding company thereof with the FDIC or the SEC in connection with an offering of equity securities of the Bank or any holding company thereof, then upon the request of Purchaser, the Bank will enter into a customary registration rights agreement (the "Registration Rights Agreement ) with Purchaser with respect to the Securities and the shares of Common Stock issuable upon conversion of the Securities, pursuant to which the Bank will agree to (a) file with the SEC, at Purchaser's demand, subject to certain exceptions, registration statements on the appropriate form under the Securities Act, including a shelf registration statement, with respect to all or part of the Securities, any Common Stock issued or issuable upon the conversion of the Securities, and any other Common Stock held by or issuable to Purchaser (collectively, the "Registrable Securities ) and (b) notify Purchaser any time the Bank proposes or is required to register any of its equity securities under

the Securities Act and use its reasonable best efforts to cause all Registrable Securities, which Purchaser has so requested the registration thereof, to be registered under the Securities Act with the securities which the Bank at such time proposes to register so as to permit the sale or other disposition by Purchaser (in accordance with the intended method of distribution thereof) of the Registrable Securities and to be so registered, including, if necessary, by filing with the SEC a post-effective amendment or a supplement to the registration statement filed by the Bank or the prospectus related thereto. The Registration Rights Agreement will contain customary covenants and agreements on behalf of the Bank, including without limitation to pay all expenses (except customary underwriter's discounts) with respect to the registration of any securities pursuant to the Registration Rights Agreement and to cooperate with Purchaser in the sale of any securities under the Registration Rights Agreement.

Section 4.11. Post-Signing Due Diligence.

(a) Purchaser shall have until May 31, 2009 (the "Diligence Period ) to complete its due diligence review of the Bank. During the Diligence Period, Purchaser shall have access to the Business Records of the Bank, in addition to any other documents reasonably requested by Purchaser for purposes of conducting its due diligence review. In the event that Purchaser is not satisfied with the results of its due diligence review for any reason, it shall have the right to terminate this Agreement by providing written notice to the Bank pursuant to Section 6.04(f).

(b) Bank shall have a period of thirty (30) days from the date of this Agreement to deliver to Purchaser the Bank Disclosure Schedule required by Section 3.01.

## ARTICLE V

### Conditions

Section 5.01. Conditions of Purchaser at Closing. The obligations of Purchaser to complete the Closing and pay the Purchase Price are subject to satisfaction or waiver of each of the following conditions precedent by Purchaser:

(a) Representations and Warranties; Covenants.

(i) The representations and warranties of the Bank (i) contained in Section 3.01(e) of this Agreement shall be true and correct in all material respects, (ii) contained in the first sentence of Section 3.01(g) and in Section 3.01(r) shall be true and correct in all respects and (iii) contained in any other Section of this Agreement and in the Ancillary Documents shall be true and correct (disregarding all qualifications or limitations set forth in such representations and warranties as to "materiality, "Material Adverse Effect and words of similar import), except, in the case of clause (iii), where the failure of such representations and warranties to be so true and correct has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, in each case on and as of the Agreement Date and the date of such Ancillary Documents, as the case may be, and on and as of the Closing Date with the same effect as though made on and as of such respective dates (unless any such representation or warranty is made only as of a specific date, in which event such representation or warranty shall be true and correct only as of such specific date); and

-30-

(ii)    the Bank shall have performed all obligations and complied with all covenants required hereunder to be performed by it at or prior to the Closing.

(b) Material Adverse Effect.  There shall not have occurred, since the date hereof, any event, circumstance, change or effect that, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect.

(c) Bank Certificate.  The Bank shall have delivered to Purchaser a certificate, dated the Closing Date, signed by an Executive Officer of the Bank, to the effect that the conditions set forth in Section 5.01(a) and Section 5.01(b) have been satisfied to the best knowledge of the officer executing the same.

(d) No Adverse Law, Action or Decision or Injunction.  There shall not be in effect any law, rule or regulation or any order, decree or injunction of a court or agency of competent jurisdiction which enjoins or prohibits consummation of the Transactions.

(e) Regulatory Approvals.  All Regulatory Approvals and other necessary approvals, authorizations and consents of any Governmental Entity required to consummate the Transactions shall have been obtained and shall remain in full force and effect and all waiting periods relating to such approvals, authorizations or consents shall have expired; and no such Regulatory Approval, other approval, authorization or consent shall include any condition, requirement or determination (x) that would, in the sole discretion of Purchaser, (i) be unsatisfactory to Purchaser in any material manner, (ii) adversely affect Purchaser or (iii) otherwise materially impair the value of the Bank to Purchaser.

(f) Closing Deliveries.  Purchaser shall have received the items to be delivered by the Bank pursuant to Section 2.03(b)(A).

(g) Regulatory Enforcement.  Except as disclosed in the Bank Disclosure Schedule, as of the date hereof, no Governmental Entity has (i) initiated an administrative or enforcement investigation or proceeding, or has taken any remedial action, including the imposition of a cease and desist order, against the Bank, directors, officers or employees or (ii) changed the status of any investigation.

(h) Legal Opinion.  The Purchaser shall have received, dated the Closing Date and addressed to the Purchaser, an opinion of Thomas, Williams, and Park LLP, outside counsel to the Company, in the form attached hereto as Schedule 5.01(h).

(i) Articles of Incorporation.  The Bank shall have filed with the Director a Fourth Amended and Restated Articles of Incorporation, in the form attached hereto as Exhibit A, and received written approval thereof.

(j) Bylaws.  The Bank shall have adopted the Amended and Restated Bylaws, in the from attached hereto as Exhibit C and provided evidence thereof reasonably satisfactory to the Purchaser and mailed the Amended and Restated Bylaws to the Department in accordance with applicable state laws.

-31-

(k) <u>Memorandum of Understanding</u>. The FDIC and the Department shall have executed that certain Memorandum of Understanding executed by the Bank on March 13, 2009, which Memorandum of Understanding shall replace the Memorandum of Understanding dated January 10, 2008.

(l) <u>Notice of New Directors</u>. The Bank's notice with respect to the addition of the new directors contemplated by Section 4.08 shall not have been disapproved by the FDIC.

Section 5.02.   <u>Conditions of Bank at Closing</u>. The obligation of the Bank to issue and sell the Securities at the Closing as contemplated by Section 2.03 is subject to satisfaction or waiver of each of the following conditions precedent:

(a) <u>Representations and Warranties; Covenants</u>. The representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects on and as of the date of this Agreement and on and as of the Closing Date with the same effect as though made on and as of such dates (unless any such representation or warranty is made only as of a specific date, in which event such representation or warranty shall be true and correct in all material respects only as of such specific date), and Purchaser shall have performed all obligations and complied with all covenants required hereunder to be performed by it at or prior to the Closing.

(b) <u>Purchaser's Certificate</u>. The managing member of Purchaser shall have delivered to the Bank a certificate, dated the Closing Date, to the effect that the condition set forth in Section 5.02(a) has been satisfied to the best knowledge of the officer executing the certificate.

(c) <u>No Adverse Action or Decision or Injunction</u>. There shall not be in effect any law, rule or regulation or any order, decree or injunction of a court or agency of competent jurisdiction which enjoins or prohibits consummation of the Transactions.

(d) <u>Closing Deliveries</u>. The Bank shall have received the items to be delivered by Purchaser pursuant to Section 2.03(b)(B).

(e) <u>Bank Holding Company</u>. Purchaser's application for the formation of a bank holding company shall have been approved by the FRB.

Section 5.03.   <u>Conditions to All Parties' Obligations</u>. The obligations of the parties to consummate the Transactions are subject to the fulfillment prior to or at the Closing of the following condition:

(a) <u>Stockholder Approval</u>. This Agreement and the Transactions shall have received the requisite Stockholder Approval.

ARTICLE VI

<u>Miscellaneous</u>

Section 6.01.   <u>Survival of Representations and Warranties</u>. All covenants and

-32-

agreements shall survive the Closing Date until expired in accordance with their terms.   Except for the representations and warranties contained in (i) Section 3.01(a), Section 3.01(b), Section 3.01(c)(i), Section 3.01(e), Section 3.01(s) and Section 3.01(u) and (ii) Section 3.02(a), Section 3.02(b) and Section 3.02(e), which shall survive the Closing until the latest date permitted by law, the representations and warranties made herein or in any Ancillary Documents or in any certificates delivered in connection with the Closing shall survive the Closing for a period of twelve (12) months and shall then expire.

Section 6.02.   Notices.   All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given, if delivered personally, by telecopier or sent by overnight courier as follows:

(a) If to the Bank, to:

Idaho First Bank
Attention: Greg Lovell
475 East Deinhard
McCall, ID 83638

Fax:  (208) 630-2002

with a copy (which shall not constitute notice) to:

Thomas, Williams and Park, LLP.
Attention: William H. Thomas
121 North 9th, Suite 300
Boise, ID 83702

Fax:  (208) 345-7894

(b) If to Purchaser:

Alcar LLC
1995 Broadway 8th Floor
New York, NY 10023-5882
Attention: Gary Lieberman

Fax:  (212) 712-2119

with a copy (which shall not constitute notice) to:

Fried, Frank, Harris, Shriver & Jacobson LLP
1001 Pennsylvania Avenue
Washington, DC 20004
Attention:  Brian T. Mangino
            David Ansell
Fax: (202) 639-7003

-33-

or to such other address or addresses as shall be designated in writing. All notices shall be effective when received.

Section 6.03. <u>Entire Agreement; Third Party Beneficiaries; Amendment</u>. This Agreement and the Ancillary Documents and the documents described herein and therein or attached or delivered pursuant hereto or thereto set forth the entire agreement between the parties hereto with respect to the Transactions, and, other than as set forth in Section 4.05(d), are not intended to and shall not confer upon any person other than the parties hereto any rights or remedies hereunder. Any provision of this Agreement may be amended or modified in whole or in part at any time by an agreement in writing between the parties hereto executed in the same manner as this Agreement. No failure on the part of any party to exercise, and no delay in exercising, any right shall operate as a waiver thereof nor shall any single or partial exercise by any party of any right preclude any other or future exercise thereof or the exercise of any other right. No investigation by any Purchaser of the Bank prior to or after the date hereof shall stop or limit Purchaser from exercising any right hereunder or be deemed to be a waiver of any such right.

Section 6.04. <u>Termination; Effect of Termination</u>. This Agreement may be terminated on or any time prior to the Closing:

(a) by the mutual written consent of the Purchaser and the Bank; or

(b) (i) by the Purchaser, if the Stockholder Approval has not been obtained by June 30, 2009 or (ii) by the Purchaser or the Bank if the Closing shall not have occurred prior to August 31, 2009, <u>provided, that</u> such date shall be automatically extended until October 31, 2009, if between the date hereof and August 31, 2009, Purchaser has continued in good faith to attempt to obtain the Regulatory Approvals, unless the failure of such occurrence under this Section 6.04(b) shall be due to the failure of the Purchaser or the Bank to perform or observe any agreement set forth herein required to be performed or observed by the Purchaser or the Bank on or before the Closing; or

(c) by the Bank, prior to receipt of Stockholder Approval, if (i) the Board of Directors shall have withdrawn, qualified or changed the Recommendation in a manner adverse to Purchaser and in favor of a Superior Proposal in the manner provided for in, and in compliance with, Section 4.09 (including, without limitation the right of Purchaser to propose revisions to the terms of this Agreement), (ii) contemporaneously with such termination, the Bank enters into a definitive acquisition, merger or similar agreement to effect the Superior Proposal; and (iii) contemporaneously therewith the Bank pays Purchaser by wire transfer of immediately available funds the Seller Termination Fee and Expenses pursuant to Section 6.08(b); or

(d) by the Purchaser or the Bank, if a Governmental Entity shall have issued a nonappealable final order, decree or ruling or taken any other action having the effect of permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement; or

(e) by the Purchaser or the Bank, (i) if any representation or warranty of the other party set forth in this Agreement or in any other Ancillary Document shall be untrue in any material respect when made, or (ii) upon a breach in any material respect of any covenant or agreement on the part of the other set forth in this Agreement or in any other Ancillary Document (either (i) or (ii) above being a "Terminating Breach"); provided, that, each Terminating Breach would cause the conditions to the non-terminating party's obligations to close under ARTICLE V not to be satisfied and such Terminating Breach is not cured within ten (10) days after written notice from the non-breaching party.

(f) by Purchaser, if (i) the Bank fails to deliver the Bank Disclosure Schedule within the time frame specified in Section 4.11(b) or (ii) prior to the expiration of the Diligence Period as provided in Section 4.11(a), Purchaser is not satisfied with its due diligence review for any reason (including its review of the Bank Disclosure Schedule); provided that Bank shall have ten business days after written notice from the Purchaser to attempt to cure any condition of the Bank causing Purchaser to terminate the Agreement pursuant to Section 6.04(f)(ii) to the satisfaction of Purchaser.

(g) by Purchaser, if (i) the Board of Directors shall have withdrawn, modified, qualified or changed the recommendation of the Transactions and Stockholder Approval in a manner adverse to Purchaser, (ii) the Board of Directors approves, endorses or recommends any Acquisition Proposal other than the Transactions, or (iii) if the Board of Directors resolves or announces its intention to do any of the foregoing, in each case whether or not permitted by Section 4.09.

(h) by Purchaser, if in order to obtain the necessary Regulatory Approvals, any Bank Regulator imposes or contemplates imposing conditions to Regulatory Approval that would, in Purchaser's sole discretion, (i) be unsatisfactory to Purchaser in any material manner, (ii) adversely affect Purchaser or (iii) otherwise materially impair the value of the Bank to Purchaser.

(i) by Purchaser or Bank, if Bank fails to receive the Fairness Opinion in accordance with Section 4.09(a) by May 30th, 2009.

(j) Notwithstanding anything else in this Agreement to the contrary, and excluding any termination pursuant to Sections 6.04 (a), (b), (d), (e), (f), (g), (h) or (i) which shall not require the payment of any fee by Purchaser, Purchaser, in its sole and absolute discretion and at any time or any circumstance, may terminate this Agreement by notice to the Bank and by making to the Bank a payment in an amount equal to $250,000 (the "Purchaser Termination Fee") in which case this Agreement shall become null and void and there shall be no obligation of either party hereto except as set forth in Section 6.08(c). In addition to the payment of the Purchaser Termination Fee, in circumstances where the Purchaser Termination Fee is payable, the Purchaser shall simultaneously with the payment of the Seller Termination Fee, reimburse the Bank for the out-of-pocket expenses incurred by the Bank (which shall include, without limitation, fees and expenses of outside legal counsel and accountants) in connection with this Agreement and the Transactions, including the fees and expenses of the Bank in preparing information for the Purchaser's due diligence investigation of the Bank in connection with the Transactions, up to a maximum expense reimbursement of $50,000. A

-35-

termination pursuant to the preceding sentence shall supersede any other termination hereunder. The parties acknowledge and agree that in the event Purchaser terminates this Agreement in accordance with the first sentence of this Section 6.04(j) that the receipt of the payment referred to in this Section 6.04(j) shall serve as liquidated damages to compensate the Bank with respect to any damages under this Agreement and be the sole and exclusive remedy of the Bank with respect to this Agreement and Purchaser shall have no further obligation hereunder or with respect hereto and shall under no circumstances be obligated to consummate the Transactions.

(k) In the event of the termination of this Agreement as provided in Section 6.04, all obligations and agreements of the parties set forth in this Agreement shall forthwith become void except for the obligations set forth in Section 6.07 (which shall remain in full force and effect) and Section 6.02 through Section 6.06, Section 6.08 and Section 6.10 through Section 6.15 and there shall be no liability or obligation on the part of the parties hereto except as otherwise provided in this Agreement.

Section 6.05.  Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to constitute an original, but all of which together shall constitute one and the same documents.

Section 6.06.  Governing Law.  This Agreement shall be governed by, and interpreted in accordance with, the laws of the State of Delaware.

Section 6.07.  Public Announcements.  Subject to each party's disclosure obligations imposed by law, each of the parties hereto will cooperate with each other in the development and distribution of all news releases and other public information disclosures with respect to this Agreement and any of the Transactions, and no party hereto will make any such news release or public disclosure without first consulting with the other party hereto.

Section 6.08.  Expenses and Fees.

(a) Except as provided in Section 6.04, if the Closing shall not occur, each party shall bear its own costs and expenses.

(b) In the event that this Agreement is terminated by (i) the Bank pursuant to Section 6.04(c), (ii) by Purchaser pursuant to Section 6.04(e) as a result of a breach of Section 4.09, (iii) by Purchaser pursuant to 6.04(g), or (iv) by Purchaser or the Bank pursuant to Section 6.04(b) or 6.04(i) and (x) an Acquisition Proposal shall have been made known to the Stockholders and not been withdrawn prior to the time of the Stockholders' Meeting (or any adjournment thereof) in the case of a termination pursuant to Section 6.04(b) or an Acquisition Proposal shall have been made known to the Bank in the case of a termination pursuant to Section 6.04(i), and (y) the Bank enters into a definitive agreement with respect to any Acquisition Proposal within twelve (12) months from the date of such termination or an Acquisition Proposal is consummated within twelve (12) months from the date of such termination, then in any case described in clauses (i)-(iv) above the Bank shall pay Purchaser (A) simultaneously with such termination in the event of a termination by the Bank described in clause (i), (B) on the second Business Day following termination by Purchaser described under clause (ii) or (iii) and (C) upon such fee becoming payable under clause (iv), by wire transfer of

same day funds the Seller Termination Fee. In addition to the payment of the Seller Termination Fee, in circumstances where the Seller Termination Fee is payable, the Bank shall simultaneously with the payment of the Seller Termination Fee, reimburse Purchaser for the out-of-pocket expenses incurred by Purchaser (which shall include, without limitation, fees and expenses of outside legal counsel and accountants) in connection with this Agreement and the Transactions, including the fees and expenses of Purchaser in preparing for and conducting a due diligence investigation of the Bank in connection with the Transactions, up to a maximum expense reimbursement of $250,000. The Bank acknowledges that the agreement contained in this Section 6.08(b) is an integral part of the Agreement, and that, without this agreement, Purchaser would not enter into this Agreement. Accordingly, if the Bank fails to promptly pay the amounts due hereunder, and, in order to obtain such payment, Purchaser commences a suit which results in a judgment rendered by a Governmental Authority against the Bank for the amounts set forth herein, the Bank shall pay to Purchaser its reasonable documented costs and expenses (including reasonable attorneys' fees) in connection with such suit.

(c) In the event that this Agreement is terminated by the Purchaser pursuant to Section 6.04(j), the Purchaser shall pay Bank an amount equal to the Purchaser Termination Fee. Any payment required to be made pursuant to this Section 6.08(c) shall be made to Bank within 3 (three) Business Days, and as a condition to the effectiveness of, the termination of this Agreement by the Purchaser pursuant to Section 6.04(j) and such payment shall be made by wire transfer of immediately available funds to an account designated by Bank.

Section 6.09.  Indemnification.

(a) The Bank agrees to indemnify and hold harmless Purchaser, each Affiliate of Purchaser and each officer, director, employee, partner, member, shareholder and agent of the Purchaser and their Affiliates in their respective capacities as such (the "Purchaser Indemnitees ), to the fullest extent lawful, from and against any and all actions, suits, claims, proceedings, damages, losses, deficiencies, liabilities, penalties, fines, interest, costs, judgments, amounts paid in settlement (subject to the penultimate sentence of Section 6.09(g) below) and expenses (including, without limitation, the cost and expenses of any litigations, actions, judgments and settlements related thereto, and the reasonable costs and expenses of attorneys and accountants incurred in the investigation or defense thereof or the enforcement of rights hereunder) (collectively, "Loss ) arising out of or resulting from (i) subject to the provisions set forth in Section 6.09(c) and Section 6.09(d), any inaccuracy in or breach of the representations or warranties made by the Bank in this Agreement or any Ancillary Document, (ii) any breach of or failure to comply with the covenants and agreements of the Bank under this Agreement or any Ancillary Document; or (iii) any action, claim, suit, or proceeding by any stockholder of the Bank or any other Person (other than the Bank or any Purchaser Indemnitee) against or involving a Purchaser Indemnitee relating to the execution and delivery of this Agreement and the Ancillary Documents or the performance by the parties of their obligations hereunder and thereunder or the consummation of the Transactions contemplated hereby and thereby, except, with respect to this clause (iii), to the extent it is determined pursuant to a final, non-appealable order of a court with competent jurisdiction that the Purchaser Indemnitees' liability is based on acts of the Purchaser Indemnitee constituting fraud, gross negligence, willful misconduct or violations of applicable law.

(b) Purchaser agrees to indemnify and hold harmless the Bank, its Affiliates and each of their respective officers, directors, employees and agents in their respective capacities as such (the "Bank Indemnitees ), to the fullest extent lawful (i) subject to the provisions set forth in Section 6.09(e), from and against any and all Losses arising out of or resulting from any inaccuracy in or breach of the representations or warranties made by Purchaser in this Agreement or any Ancillary Document, and (ii) any breach of or failure to comply with the covenants and agreements of Purchaser under this Agreement or any Ancillary Document.

(c) For purposes of the indemnity contained in Section 6.09(a)(i), the Material Adverse Effect and other materiality (or correlative meaning) qualifications included in the representations and warranties contained herein shall have no effect on any provisions in this Section 6.09 concerning the indemnities of the Bank or Purchaser with respect to such representations and warranties, each of which representations and warranties shall be read as though there were no Material Adverse Effect or other materiality qualification for purposes of such indemnities.

(d) Notwithstanding anything to the contrary set forth in this Agreement, except in the case of fraud, the Purchaser Indemnitees shall not make a claim against the Bank for indemnification under Section 6.09(a)(i) (not including indemnification for breaches of the representations and warranties made by the Bank in Section 3.01(e)) for Purchaser Losses unless and until the aggregate amount of Purchaser Losses under Section 6.09(a)(i) (not including indemnification for breaches of the representations and warranties made by the Bank in Section 3.01(e)) exceeds $100,000 (the "Deductible ) and then the Purchaser Indemnitees shall be entitled to indemnification for all Losses in excess of the Deductible. The aggregate amount of Purchaser Losses for which the Bank is obligated to indemnify Purchaser in respect of claims under Section 6.09(a)(i) shall not exceed $7,100,000 (the "Cap ).

(e) Notwithstanding anything to the contrary set forth in this Agreement, except in the case of fraud, the Bank Indemnitees shall not make a claim against Purchaser for indemnification under Section 6.09(b)(i) for Bank Losses unless and until the aggregate amount of Bank Losses under Section 6.09(b)(i) exceeds the Deductible and then the Bank Indemnitees shall be entitled to indemnification for all Losses in excess of the Deductible. The aggregate amount of Bank Losses for which Purchaser is obligated to indemnify the Bank in respect of claims under Section 6.09(b)(i) shall not exceed $7,100,000.

(f) A party obligated to provide indemnification under this Section 6.09 (an "Indemnifying Party ) shall reimburse the indemnified parties of the other party (the "Indemnified Parties ) for all reasonable out-of-pocket expenses (including attorneys' fees and disbursements) as they are incurred in connection with investigating, preparing to defend or defending any such action, suit, claim or proceeding (including any inquiry or investigation) whether or not an Indemnified Party is a party thereto. If an Indemnified Party makes a claim under this Section 6.09 for payment or reimbursement of expenses, such expenses shall be paid or reimbursed promptly upon receipt of appropriate documentation relating thereto even if the Indemnifying Party reserves the right to dispute whether this Agreement requires the payment or reimbursement of such expenses.

(g) An Indemnified Party shall give written notice to the Indemnifying Party of any claim with respect to which it seeks indemnification promptly after the discovery by such party of any matters giving rise to a claim for indemnification; *provided* that the failure of any Indemnified Party to give notice as provided herein shall not relieve the Indemnifying Party of its obligations under this Section 6.09 unless and to the extent that the Indemnifying Party shall have been materially prejudiced by the failure of such Indemnified Party to so notify such party. In case any such action, suit, claim or proceeding is brought against an Indemnified Party, the Indemnified Party shall be entitled to hire, at its own expense, separate counsel and participate in the defense thereof unless there are conflicts that make it reasonably necessary for separate counsel to represent the Indemnifying Party and the Indemnified Party, in which case the Indemnifying Party shall pay such expenses; provided, however, that the Indemnifying Party shall be entitled to assume and conduct the defense, unless the Indemnifying Party determines otherwise and following such determination the Indemnified Party assumes responsibility for conducting the defense (in which case the Indemnifying Party shall be liable for any legal or other expenses reasonably incurred by the Indemnified Party in connection with assuming and conducting the defense). No Indemnifying Party shall be liable for any settlement of any action, suit, claim or proceeding effected without its written consent; provided, however, the Indemnifying Party shall not unreasonably withhold, delay or condition its consent. The Indemnifying Party further agrees that it will not, without the Indemnified Party's prior written consent, settle or compromise any claim or consent to entry of any judgment in respect thereof in any pending or threatened action, suit, claim or proceeding in respect of which indemnification may be sought hereunder (whether or not any Indemnified Party is an actual or potential party to such action, suit, claim or proceeding) unless such settlement or compromise includes an unconditional release of each Indemnified Party from all liability arising out of such action, suit, claim or proceeding.

(h) The obligations of the Indemnifying Party under this Section 6.09 shall survive the transfer or redemption of the Securities, the Closing and termination of this Agreement, any Ancillary Document, and the Transactions. The agreements contained in this Section 6.09 shall be in addition to any other rights of the Indemnified Party against the Indemnifying Party or others, at common law or otherwise.

(i) The amount the Indemnifying Party shall pay to the Indemnified Party with respect to a claim made pursuant to this Section 6.09 shall be an amount equal to the Loss incurred by the Indemnified Party with respect to such claim, after giving effect to any taxes payable by the Indemnified Party on receipt of any indemnification hereunder with respect to such claim and any tax benefit actually realizable (including deductions) by the Indemnified Party with respect to such claim for tax purposes.

(j) Notwithstanding anything to the contrary in this Section 6.09, if and to the extent any Ancillary Document provides for indemnification with respect to matters for which indemnity is provided by Section 6.09(a) or Section 6.09(b) of this Agreement, the indemnity provisions of such Ancillary Document shall govern and control.

Section 6.10.  Successors and Assigns.  Except as otherwise expressly provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the Bank's successors and assigns and Purchaser's successors and assigns, and no other person.

Section 6.11.  Remedies; Waiver.  To the extent permitted by law, all rights and remedies existing under this Agreement or any Ancillary Documents are cumulative to, and are exclusive of, any rights or remedies otherwise available under applicable law.  No failure on the part of any party to exercise, or delay in exercising, any right hereunder shall be deemed a waiver thereof, nor shall any single or partial exercise preclude any further or other exercise of such or any other right.

Section 6.12.  [Reserved.]

Section 6.13.  Consent to Jurisdiction; WAIVER OF JURY TRIAL.  Each of the parties hereto (a) consents to submit itself to the personal jurisdiction of any Federal or state court located in Ada County, Idaho in the event any dispute arises out of this Agreement, any of the Ancillary Documents or the Transactions, (b) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court and (c) agrees that it will not bring any action relating to this Agreement, any of the Ancillary Documents or the Transactions in any court other than a Federal or state court located in Ada County, Idaho.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 6.14.  Severability.  If any provision of this Agreement is determined to be invalid, illegal, or unenforceable, the remaining provisions of this Agreement shall remain in full force and effect; *provided* that the economic and legal substance of, any of the Transactions is not affected in any manner materially adverse to any party.  In the event of any such determination, the parties agree to negotiate in good faith to modify this Agreement to fulfill as closely as possible the original intent and purpose hereof.  To the extent permitted by law, the parties hereby to the same extent waive any provision of law that renders any provision hereof prohibited or unenforceable in any respect.

Section 6.15.  Headings.  The headings of Articles and Sections contained in this Agreement are for reference purposes only and are not part of this Agreement.

Section 6.16.  Aggregation.  For purposes of the rights of Purchaser that are contingent on ownership of Common Stock, under Section 4.02, Purchaser's ownership of Common Stock then outstanding shall be calculated in the aggregate among Purchaser and its controlled Affiliates.

Section 6.17.  Specific Performance.  The parties hereto agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof in the United States District Court for the District of Idaho or any Idaho State court sitting in Ada County, Idaho in addition to any other remedy to which they are entitled at law or in equity.

Section 6.18.  Arm's Length Transactions.  This Agreement and the Transactions contemplated hereby have been negotiated and entered into by the parties on an arms-length

basis, and the Bank expressly acknowledges and agrees that neither Purchaser nor any of its Affiliates is, or has acted in any capacity as, an advisor to the Bank in connection with this Agreement or the Transactions contemplated hereby.

Section 6.19.   No Presumption.  If any claim is made by a party relating to any conflict, omission or ambiguity in this Agreement or any Ancillary Document, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement or any Ancillary Document was prepared by or at the request of a particular party or its counsel.

Section 6.20.   Further Assurance.  If at any time after the Closing any further action is necessary or desirable to fully effect the transactions contemplated by this Agreement or any other of the Ancillary Documents, each of the parties shall take such further action (including the execution and delivery of such further instruments and documents) as any other party reasonably may request.

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto or by their respective duly authorized officers, all as of the date first above written.

IDAHO FIRST BANK

By:_____

Name:      Greg Lovell

Title:       President and CEO


ALCAR LLC

By:_____

Name:      Gary Lieberman

Title:       Managing Member


[Preferred Stock Purchase Agreement Signature Page]